**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

CASE NO. _____

| | |
|---|---|
| **SHERRY L. BODNAR, on Behalf of herself and All Others Similarly Situated,** | **CLASS ACTION COMPLAINT** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | |
| **BANK OF AMERICA, N.A.,** | |
| **Defendant.** | |

**CLASS ACTION COMPLAINT**

Plaintiff Sherry Bodnar ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

**INTRODUCTION**

1.     Plaintiff brings this action on behalf of herself and a class of all similarly situated consumers against Defendant Bank of America, N.A. ("BofA" or "Bank"), arising from its unfair and unconscionable assessment of overdraft fees or insufficient funds fees (collectively, "overdraft fees") on transactions for which there are sufficient available funds in customers' accounts at the time the transactions are authorized and approved by the Bank.

2.     Though customers' accounts have sufficient available funds to cover these transactions, BofA assesses overdraft fees through the implementation of a policy and procedure by which an overdraft fee determination is made not only at the time the transaction is authorized and approved, but also when the transaction "settles" and posts to customers' accounts, in

violation of its account agreement.   BofA employs this so-called "double overdraft determination" in order to increase the number of overdraft fees or non-sufficient funds fees (collectively "overdraft fees") charged on its customers' checking accounts.

3.      Here is how it works.   A customer's available funds are the funds that BofA considers "available" for immediate use; therefore, the "available" balance is adjusted to account for holds placed for pending deposits and pending debit transactions.   This available balance differs from the customer's "ledger balance," which reflects the amount of money that is in the customer's account, without regard for any transaction holds.

4.      When a customer makes a purchase with a debit card, BofA sequesters the funds needed to pay the transaction by placing a "hold" on the customer's account, which subtracts the dollar amount of the transaction from the customer's "available balance."   For purposes of clarity, this transaction shall be referred to as "Transaction A."

5.      Although at the time of an electronic debit transaction BofA places a hold on a customer's account in the dollar amount of the transaction (which reduces the customer's available balance), BofA may not in fact pay the merchant for the purchase for several days, when that transaction "settles."

6.      In the meantime, when any *subsequent* debit transactions are initiated (for purposes of clarity, such transactions shall be referred to collectively as "Transaction B") are compared against an "available balance" that has been reduced to account for Transaction A.   In other words, the funds being "held" to pay Transaction A are unavailable to be used to pay Transaction B.   If Transaction B is initiated into a negative or insufficient balance, BofA will either pay that transaction and charge an overdraft fee, or it will decline the transaction.

2

7.      However, BofA then charges an ***additional*** overdraft fee when it uses the money it has previously placed on "hold" (and which has already been deleted from the customer's available balance) to "settle" Transaction A if the amount of the transaction exceeds the accountholder's available balance at the time of settlement.

8.      In other words, BofA: (a) sequesters funds for the future payment of particular electronic transactions at a time in which a customer's account has a sufficient available balance; (b) the sequestration reduces the available balance when subsequent transactions are paid, which may cause those transactions to result in overdraft fees; and (c) when the initial transactions (for which funds were sequestered) finally settle and are paid to the merchant, BofA charges overdraft fees, despite the fact that the transactions were authorized and approved into sufficient available balances, *and* despite the fact that the payment of a held transaction does not affect in any way the available balance.

9.      This practice violates BofA's account agreement, which provides that BofA can assess overdraft fees only when a customer's account has an insufficient available balance (not ledger balance) to cover a particular transaction. The practice also violates BofA's account agreement, which states that BofA makes only a *single* overdraft determination for each transaction.  Lastly, the practice violates the account agreement, which states that such overdraft determination is made once, at the time the transaction is initially authorized.

10.     Plaintiff and other BofA customers have been injured by BofA's improper practices.   On behalf of herself and the putative class, Plaintiff seeks damages, restitution and injunctive relief for BofA's breach of contract, unjust enrichment, conversion, and violation of the Pennsylvania unfair trade practices statute.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness

Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BofA.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here and regularly conducts business in the Eastern District of Pennsylvania, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

13.    Plaintiff is a citizen of the Commonwealth of Pennsylvania.  At all times relevant, Plaintiff patronized the BofA banking center located at 3300 Lehigh Street, Allentown, Pennsylvania, 18103, which is in Lehigh County.

14.    Defendant BofA is a national bank with its headquarters and principal place of business located in Charlotte, NC.  Among other things, BofA is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts.  BofA operates banking centers, and thus conducts business, throughout the Commonwealth of Pennsylvania.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

15.    Plaintiff has had checking accounts with BofA since 2009.

16.    BofA issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

4

17.     Pursuant to its standard account agreement, BofA charges fees (currently in the amount of $35) for debit card transactions that purportedly overdraw a customer's account.

A.      **Mechanics of a Debit Card Transaction**

18.     A typical debit card transaction occurs in two parts, whether it is a one-time transaction for a routine daily purchase or whether it is a recurring debit card transaction for a repeat household expense.   First, authorization for the purchase amount is obtained by the merchant.  When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to the customer's bank, which verifies that the customer's account is valid and that sufficient funds are available to cover the transaction's cost.    At this step, Bank of America holds the funds and reduces the customer's available balance by a corresponding amount, but does not yet transfer the funds to the merchant.

19.     Sometime thereafter, the payment is processed, wherein the funds are actually transferred from the customer's account to the merchant's account.   This process is not instantaneous; it can take as long as several days.  The actual payment is not made until the merchant submits the transaction to the bank and the bank actually transfers the funds to the merchant, at which time the customer's account is debited, the customer's actual balance is reduced by the amount of the payment, and the "hold" is released.

20.     With limited exceptions not relevant here, the actual payment of the transaction and the release of the "hold" have no impact on the customer's available balance, since the available balance has already been reduced by the amount of the transaction at the time of the transaction and the imposition of the hold.

### B.    BofA's Account Agreement

21.     Plaintiff's checking account with BofA was, at all relevant times, governed by BofA's standardized contract for deposit accounts, the material terms of which are drafted by BofA, amended by BofA from time to time at its convenience and complete discretion, and imposed by BofA on all of its customers.  A copy of the Deposit Agreement and Disclosure in effect from December 5, 2012, through May 15, 2014 ("Account Agreement") is attached as Exhibit A.  A copy of the revised Deposit Agreement and Disclosures recently made effective as of May 16, 2014, is attached as Exhibit B.

22.     Within the Account Agreement are the following relevant provisions which, were imposed by BofA on all members of the putative classes.

23.     BofA has agreed not to charge overdraft fees on <u>one-time</u> debit card transactions that are authorized on a negative balance.  Indeed, BofA agreed to refuse to approve one-time debit card transactions unless it believes the transaction is drawn on a sufficient funds balance:

> *With our Standard Overdraft Setting*, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions.  This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction.  There is an exception for some ATM withdrawals.  We may occasionally give you the opportunity at our ATMs to agree to our overdraft practices for a specific ATM withdrawal and, if you agree, we authorize and pay that ATM withdrawal.  Please note that overdraft fees can apply to these withdrawals.  We tell you at our ATM when this is available.

Account Agreement, p. 12 (emphasis in original).

24.     BofA does, however, charge overdraft fees on other kinds of electronic and paper debit transactions, including certain ATM transactions and recurring debit card transactions:

> With this overdraft setting, we may authorize and pay overdrafts for other types of transactions.  Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions,

ACH transactions, preauthorized payments, and automatic and online bill payments.  For more examples of other transactions, please review the definition of items.

*Id.*

25.     BofA limits daily overdraft or NSF fees to a maximum of four per day.

26.     At the time of an electronic debit transaction, BofA places a hold on, and reduces, an accountholder's available balance by the amount of the transaction.

27.     BofA's Account Agreement states that overdraft fees are assessed based on available (not actual or "ledger") balances:

Insufficient Funds – Overdrafts and Returned Items

***You can avoid fees for overdrafts and declined or returned items by making sure that your account always contains sufficient available funds to cover all of your transactions.***  We offer services that you can use to help you manage your account and help you avoid overdrafts, such as our Online Banking service and Online Alerts.

Account Agreement, p. 11 (emphasis added).

28.     BofA states that it determines whether or not a transaction has overdrawn an account <u>at the time the transaction is initiated</u> by an accountholder:

Overdrafts and Declined or Returned Items

***When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item.*** If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item. Otherwise, without notice to you, ***we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).***

*Id.* (emphasis added).

29.     Moreover, BofA makes clear that it makes an "available balance" overdraft fee determination only <u>one time</u> during an electronic transaction's life-cycle.

Paying Checks and Other Items

We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, **_or_** on the day we receive notice that the item has been deposited for collection at another financial institution — whichever is earlier.  If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We may determine your balance and make our decision on an insufficient funds item at any time between our receipt of the item or notice and the time we must return the item.

Account Agreement, p. 21 (emphasis added).

### C.     BofA's Actual Practice Violates the Account Agreement

30.    Contrary to the terms of the Account Agreement, BofA charges overdraft fees even on transactions that were approved and authorized into a sufficient available balance.

31.    Indeed, BofA charges overdraft fees on such transactions at the time of settlement—even when such settlement in no way alters the available balance on an account (since the available balance has already been reduced, at the time of authorization, to account for the transaction).  BofA can only charge an overdraft fee on such a transaction by assessing an overdraft fee based on a "ledger" balance, in violation of the Account Agreement.

32.    Contrary to the terms of the Account Agreement, BofA actually debits accounts *twice* for purposes of assessing OD fees—once at the time of authorization and once at the time of "settlement."

33.    Contrary to the express language in the agreement BofA effectively double-counts electronic transactions by reducing the available balance at the time that the transaction is initiated (causing other transactions to incur overdraft fees), and then charging an overdraft fee when the Bank subsequently pays the transaction from the funds it already sequestered.

34.     Thus, contrary to the Account Agreement, BofA makes two separate overdraft fee determinations on the same transactions.  *Cf.*, paragraph 23, *supra*.

35.     For example, Plaintiff was assessed four overdraft fees on May 29, 2013, for transactions that were posted to her account on May 28, 2013, despite her account having a positive ledger balance at all times on May 28, 2013.  In other words, none of the transactions that posted to Plaintiff's account on May 28, 2013 resulted in the actual funds in her account at the end of May 28, 2013, falling below $0.00.  Indeed, Plaintiff's ledger balance on May 28, 2013 was $368.33 and her ledger balance on May 29, 2013, was $36.66.

36.     Thus, Plaintiff's account could have only been assessed overdraft fees due to a negative "available balance," created as a result of "holds" on transactions that were authorized and approved on or before May 28, 2013, but that had not yet settled to Plaintiff's account.

37.     Then, on May 29, 2013, the following three transactions, which were authorized prior to May 29, 2013, settled to Plaintiff's account: (1) $180.00 debit card purchase authorized on May 28, 2013; (2) $29.99 debit card transaction authorized on May 28, 2013; and (3) $9.40 debit card transaction authorized on May 27, 2013.  Each of these transactions had been authorized and approved into a sufficient available balance.

38.     BofA placed holds in the total amount of the three transactions ($219.39).  On May 28, that had the effect of reducing Plaintiff's available balance by that same amount.  The reduction in Plaintiff's available balance by the amount of the held transactions resulted in overdraft fees for the recurring debit card transactions, ACH transactions, and check transaction (all transactions other than one-time debit card transactions) that settled on May 28, 2013.

39.     Indeed, without these three holds, Plaintiff's account would have had a sufficient available balance to pay *all* transactions that settled on May 28, 2013, and therefore, her account

would not have been assessed *any* overdraft fees on May 29, 2013.  Instead, pursuant to its overdraft policy, BofA charged the maximum *four* overdraft fees on the above eligible transactions.

40.    But BofA did not stop there.  On May 30, 2013, BofA assessed overdraft fees for two of three held transactions that settled on May 29, 2013.  Thus, BofA charged overdraft fees on the very same transactions that were authorized and approved into sufficient available balances and that it had used to reduce Plaintiff's available balance on May 28, 2013, which in turn, led to the assessment of four overdraft fees on that date.

41.    BofA assessed overdraft fees on the held transactions even though the available balance of Plaintiff's account did not *change* at all when those transactions settled (since they had already been deducted from the available balance).

42.    In violation of the contract, BofA charged overdraft fees on the "hold" transactions, *both of which were authorized into a positive available balance*—despite its promise to make only *one* available balance determination on such transactions, and despite its promise not to use anything but an "available balance" to assess overdraft fees.  Because the available balance necessarily could not have changed for transactions already subject to a "hold," BofA necessarily used a ledger balance to assess overdraft fees.

43.    In short, BofA charged overdraft fees on the "hold" transactions even though all that occurred was that BofA used the money it had already sequestered and deleted from Plaintiff's available balance to pay the transactions.

## CLASS ALLEGATIONS

44.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

45.     The proposed classes are defined as:

All Bank of America checking account holders in the United States who, from May 25, 2011, through the date of class certification, were charged overdraft fees on transactions that were authorized and approved into a positive available balance (the "National Class").

All Bank of America checking account holders in Pennsylvania who, from May 25, 2011, through the date of class certification, were charged overdraft fees on transactions that were authorized and approved into a positive available balance (the "Pennsylvania Sub-Class").

The National Class and the Pennsylvania Subclass are collectively referred to as the "Classes."

46.     The above Classes expressly exclude all claims released by the Settlement Agreement and Release in the actions titled: *Tornes, et al. v. Bamk of America, N.A.*, S.D. Fla. Case. No. 1:08-cv-23323-JLK; *Yourke, et al. v. Bank of America, N.A.*, S.D. Fla. Case No. 1:09-cv-21963-JLK, N.D. Cal. Case No. 3:09-2186; and *Phillips, et al. v. Bank of America, N.A.*, S.D. Fla. Case No. 1:10-cv-24316-JLK, W.D. Okla. Case No. 5:10-cv-01185-R.

47.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

48.     Excluded from the Classes are BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

49.     The members of the Classes are so numerous that joinder is impractical.  The

Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BofA's records.

50.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by BofA as a result of charging overdraft fees on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at the time the transactions were settled.  The representative Plaintiff, like all Class members, has been damaged by BofA's misconduct in that they have been assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of BofA's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

51.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

52.     Among the questions of law and fact common to the Classes are whether BofA:

        a.     Manipulated customer's available balances so that it can increase the number of overdraft fees it imposes;

        b.     Imposed overdrafts and overdraft fees when transactions were authorized into sufficient available balances;

        c.     Failed to provide customers with accurate balance information;

        d.     Delayed posting of transactions by customers using debit cards so that customers were charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

        e.     Breached its covenant of good faith and fair dealing with Plaintiff and

other members of the Classes through its overdraft policies and practices;

       f.     Converted money belonging to Plaintiff and other members of the Classes through its overdraft policies and practices;

       g.     Was unjustly enriched through its overdraft policies and practices; and

       h.     Violated the consumer protection acts of certain states through its overdraft policies and practices.

53.    Other questions of law and fact common to the Classes include:

       a.     The proper method or methods by which to measure damages, and

       b.     The declaratory relief to which the Classes are entitled.

54.    Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices of BofA's Account Agreement and other related documents.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

55.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BofA, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and BofA's misconduct will proceed without remedy.

57.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of the National Class)

58.     Plaintiff repeats paragraphs 1 through 57 above.

59.     Plaintiff and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

60.     No contract provision authorizes BofA to charge overdraft fees on transactions that were approved and authorized into a sufficient available balance.

61.     In addition, no contract provision authorizes BofA to use the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction.

62.     Therefore, BofA breached the terms of its Account Agreement by charging overdraft fees on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at the time the transactions were settled.

63.     Plaintiff and members of the National Class have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

64.     Plaintiff and members of the National Class have sustained damages as a result of BofA's breach of the Account Agreement.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of the National Class)

65.     Plaintiff repeats paragraphs 1 through 57 above.

66.     Plaintiff and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

67.     Under the laws of the states where BofA does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

68.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

69.     BofA has breached the covenant of good faith and fair dealing in the Account Agreement through its overdraft policies and practices as alleged herein.

15

70.    Plaintiff and members of the National Class have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

71.    Plaintiff and members of the National Class have sustained damages as a result of BofA's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
### Conversion
### (On Behalf of the National Class)

72.    Plaintiff repeats paragraphs 1 through 57 above.

73.    BofA had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

74.    BofA has wrongfully collected overdraft fees from Plaintiff and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

75.    BofA has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the National Class, without legal justification.

76.    BofA continues to retain these funds unlawfully without the consent of Plaintiff or members of the National Class.

77.    BofA intends to permanently deprive Plaintiff and the members of the National Class of these funds.

78.    These funds are properly owned by Plaintiff and the members of the National Class, not BofA, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the National Class.

79.    Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

80.     BofA has wrongfully converted these specific and readily identifiable funds.

81.     BofA's wrongful conduct is continuing.

82.     As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the National Class have suffered and continue to suffer damages.

83.     By reason of the foregoing, Plaintiff and the members of the National Class are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the National Class)**

84.     Plaintiff repeats paragraphs 1 through 57 above.

85.     Plaintiff, on behalf of herself and the National Class, assert a common law claim for unjust enrichment.

86.     By means of BofA's wrongful conduct alleged herein, BofA knowingly provided banking services to Plaintiff and members of the National Class that was unfair, unconscionable, and oppressive.

87.     BofA knowingly received and retained wrongful benefits and funds from Plaintiff and members of the National Class.  In so doing, BofA acted with conscious disregard for the rights of Plaintiff and members of the National Class.

88.     As a result of BofA's wrongful conduct as alleged herein, BofA has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the National Class.

89.     BofA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

90.     Under the common law doctrine of unjust enrichment, it is inequitable for BofA

to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the National Class in an unfair, unconscionable, and oppressive manner. BofA's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

91. The financial benefits derived by BofA rightfully belong to Plaintiff and members of the National Class. BofA should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the National Class all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by BofA traceable to Plaintiff and the members of the National Class.

92. Plaintiff and members of the National Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Pennsylvania's Unfair Trade Practices and Consumer Protection Law
**(On Behalf of the Pennsylvania State Subclass)**

93. Plaintiff repeats paragraphs 1 through 57 above.

94. This claim is asserted on behalf of the members of the Pennsylvania Subclass under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), PA ST 73 P.S. § 201-1, *et seq.*

95. BofA engaged in unfair and/or deceptive acts or practices relating to the imposition of overdraft fees on consumers, in violation of the UTPCPL, PA ST 73 P.S. § 201-1, *et seq.*

96. The UTPCPL, PA ST 73 P.S. § 201-3 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

97. PA ST 73 P.S. § 201-2(4)(xxi) defines "unfair methods of competition" and "unfair or deceptive acts or practices" as "engaging in any other fraudulent tor deceptive conduct

which creates a likelihood of confusion or misunderstanding."

98.     Pursuant to PA ST 73 P.S. § 201-9.2, *et seq.*, Plaintiff and members of the Pennsylvania Subclass purchased services, in the form of banking services, from BofA that were used primarily for personal, family or household purposes.

99.     BofA engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance, and misrepresenting and failing to disclose its policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance in its Account Agreement and related documents.

100.    BofA also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction, and misrepresenting and failing to disclose its policy and practice of using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction in its Account Agreement and related documents.

101.    BofA intended that Plaintiff and the members of the Pennsylvania State Subclass rely on the acts of concealment and omissions, so that Plaintiff and the members of the Pennsylvania State Subclass would continue to incur overdraft fees.

102.    BofA's conduct caused Plaintiff and the members of the Pennsylvania State Subclass to suffer ascertainable losses in the form of excessive overdraft fees that, but for BofA's

unfair and deceptive policy of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance and using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction, would not otherwise have been imposed.

103.    A causal relationship exists between BofA's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the Pennsylvania State Subclass. Had BofA charged overdraft fees on transactions only if they were approved and authorized into an insufficient balance, and made only a single overdraft fee determination for each transaction, Plaintiff and the members of the Pennsylvania State Subclass would not have incurred excessive overdraft fees in violation of the UTPCPL.

104.    As redress for BofA's repeated and ongoing violations of the UTPCPL, Plaintiff and the Pennsylvania State Subclass are entitled to, *inter alia*, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Declaring BofA's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.    Restitution of all overdraft fees paid to BofA by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived by BofA from its misconduct;

4.    Actual damages in an amount according to proof;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the maximum rate permitted by applicable law;

7.    Costs and disbursements assessed by Plaintiff in connection with this action,

including reasonable attorneys' fees pursuant to applicable law; and

       8.     Such other relief as this Court deems just and proper.

Dated: June 6, 2014.

                     /s/ James C. Shah
                     James C. Shah
                     **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
                     35 E. State Street
                     Media, PA 19063
                     Telephone: (610) 891-9880
                     Facsimile: (610) 891-9883
                     jshah@sfmslaw.com

                     Hassan A. Zavareei (*pro hac vice* to be filed)
                     Jeffrey Kaliel (*pro hac vice* to be filed)
                     **TYCKO & ZAVAREEI LLP**
                     2000 L Street, N.W., Suite 808
                     Washington, D.C. 20036
                     Telephone: (202) 973-0900
                     Facsimile: (202) 973-0950
                     hzavareei@tzlegal.com
                     jkaliel@tzlegal.com

                     Jeffrey M. Ostrow (*pro hac vice* to be filed)
                     Jason H. Alperstein (*pro hac vice* to be filed)
                     **KOPELOWITZ OSTROW P.A.**
                     200 S.W. First Avenue, 12th Floor
                     Fort Lauderdale, FL 33301
                     Telephone: (954) 525-4100
                     Facsimile: (954) 525-4300
                     ostrow@kolawyers.com
                     alperstein@kolawyers.com

                     *Counsel for Plaintiff and the Proposed Classes*