### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

### CASE NO. 5:14-cv-03224-EGS

| | |
|---|---|
| **SHERRY L. BODNAR, on Behalf of herself and All Others Similarly Situated,** | **CLASS ACTION COMPLAINT** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | |
| **BANK OF AMERICA, N.A.,** | |
| **Defendant.** | |

### AMENDED CLASS ACTION COMPLAINT

Plaintiff Sherry Bodnar ("Bodnar"), brings this lawsuit on behalf of herself and all others similarly situated.

### INTRODUCTION

1.      Bodnar brings this action on behalf of herself and a class of all similarly situated consumers against Defendant Bank of America, N.A. ("BofA" or "Bank"), arising from its unfair and unauthorized assessment of overdraft fees on so-called "recurring" debit card transactions for which there were sufficient available funds in customers' accounts at the time the transactions were authorized and approved by the Bank.

2.      At the moment recurring debit card transactions are authorized, BofA sets aside funds available in a checking account to cover that specific transaction.  As a result, and with limited exceptions,[1] customers' accounts always have sufficient available funds to cover these

---

[1] A miniscule number of recurring debit card transactions settle for an amount different than the amount initially authorized.

transactions throughout their entire life-cycle. Accordingly, the assessment of overdraft fees on such transactions is improper.

3.      But that is exactly what BofA does.  Despite putting aside sufficient available funds to pay recurring debit card transactions when they later post, the Bank charges overdraft fees on those same transactions if they purportedly settle—days later—into a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN Transactions").

4.      Here is how it works.  A customer's available funds are the funds that BofA considers "available" for immediate use; therefore, the "available" balance is adjusted, in real-time, to account for debit card transactions at the time they are made.   When a customer makes a purchase with a debit card, BofA sequesters the funds needed to pay the transaction by placing a "hold" or "memo debit" on the customer's account, which subtracts the dollar amount of the transaction from the customer's available balance or funds available.  A hold or memo debit is a transaction that reduces an available balance or funds available. Held funds are not available for any other use by the accountholder, and held funds are specifically associated with a given debit card transaction.

5.      That means when any *subsequent*, intervening debit transactions are initiated, they are compared against an "available balance" that has been reduced to account for the hold transactions.   In other words, the funds being "held" cannot be used to pay subsequent transactions.   This means that many subsequent transactions incur overdraft fees due to the unavailability of the "held" funds for those debit card transactions.

6.      Still, despite placing debit holds and despite keeping those held funds off-limits for other transactions, BofA improperly charges overdraft fees on APPSN Transactions.

7.      But it gets much worse.  For a subset of APPSN Transactions, BofA actually uses the same transaction <u>twice</u> to cause different overdraft fees.  That is because a significant portion of the debit holds associated with APPSN Transactions contributed to overdraft fees being assessed to other, later transactions.  In other words, not only does BofA assess overdraft fees on transactions it authorized into a positive balance, but in some cases the same debit hold contributes to an intervening overdraft fee on other transactions.

8.      There is simply no justification for these practices, other than to maximize BofA's overdraft fee revenue.   APPSN Transactions only exist, according to the Bank, because intervening checking account transactions supposedly reduce the "available balance" or "funds available" on an account.   But BofA is free to protect its interests and either reject those intervening transactions or charge overdraft fees on those intervening transactions—and it does the latter to the tune of billions of dollars each year.   But BofA was not content with these billions in overdraft fees.   Instead, it sought hundreds of millions *more* in overdraft fees on APPSN Transactions.   No justification exists for charging both—especially when the Bank's own contract documents never authorized this unconscionable set of APPSN Transaction overdraft fees.

9.      Besides being unfair and unconscionable, these practices breach contract promises made in the Bank's adhesion contracts—contracts that fundamentally misconstrue the true nature of the Bank's processes and practices.   These practices also exploit contractual discretion to gouge consumers.

10.      In plain, clear, and simple language, the checking account contract documents promise that the Bank will <u>only</u> charge overdraft fees on transactions with insufficient available funds to "cover" a given transaction:

> You can avoid fees for overdrafts . . . by making sure that your account always contains **sufficient available funds to cover** all of your transactions.

Ex. A, December 2012 Deposit Agreement, at 11 (emphasis added).

11.     The Bank breaches this plain contractual promise when it assesses overdraft fees on APPSN Transactions that **_do_** have sufficient available funds to "cover" them throughout their lifecycle.  Indeed, "covering" is the very purpose of the transaction-specific debit hold.  There are always available funds sufficient to cover electronic transactions authorized into a positive available balance, for the simple reason that those funds are subject to a debit hold at the instant of authorization.

12.     Indeed, that is consistent with BofA's actual processing.  The Bank maintains a running, real time, intraday "available" balance or funds calculation.  And that available balance or funds calculation <u>never</u> results in a negative balance for APPSN Transactions. At settlement, the held funds associated with a settling transaction are simply applied to that transaction—and the effect on the available balance is a "wash."

13.     The contract also fundamentally misconstrues the process by which overdraft transactions are determined.  Indeed, while the contract states that overdraft fees will be assessed on insufficient available funds, the Bank does not actually use available balance or available funds to make overdraft determinations at all—it uses a separate, secret "processing" balance during the middle of the night "batch processing."  Bank of America does not use an "available" funds or balance calculation at all during nightly batch processing, when overdraft fees are determined.  Available balance or funds is are terms exclusively used for real-time, intraday processing—the very processing during which debit card transactions are authorized and "held," and the very balance that remains unchanged at settlement.

14.     Bodnar and other BofA customers have been injured by BofA's improper practices.   On behalf of herself and the putative class, Bodnar seeks damages, restitution and injunctive relief for BofA's breach of contract, unjust enrichment, conversion, and violation of the Pennsylvania unfair trade practices statute.

**JURISDICTION AND VENUE**

15.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BofA.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here and regularly conducts business in the Eastern District of Pennsylvania, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**PARTIES**

17.     Bodnar is a citizen of the Commonwealth of Pennsylvania.  At all times relevant, Bodnar patronized the BofA banking center located at 3300 Lehigh Street, Allentown, Pennsylvania, 18103, which is in Lehigh County.

18.     Defendant BofA is a national bank with its headquarters and principal place of business located in Charlotte, NC.  Among other things, BofA is engaged in the business of providing retail banking services to consumers, including Bodnar and members of the putative classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts.  BofA operates banking centers, and thus conducts business, throughout the Commonwealth of Pennsylvania.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

19.     Bodnar has had checking accounts with BofA since 2009.

20.     BofA issues debit cards to its checking account customers, including Bodnar, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

21.     Pursuant to its standard account agreement, BofA charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft.

### A.     Mechanics of a Debit Card Transaction

22.     A typical debit card transaction occurs in two parts, whether it is a one-time transaction for a routine daily purchase or whether it is a recurring debit card transaction for a repeat household expense.   First, authorization for the purchase amount is obtained by the merchant.   When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to the customer's bank, which verifies that the customer's account is valid and that sufficient funds are available to cover the transaction's cost.

23.     At this step, for recurring debit card transactions drawn on an account with positive available funds, Bank of America places a hold on funds in the amount of the transaction and reduces the customer's available funds or balance by a corresponding amount, but does not yet transfer the funds to the merchant.

24.     In other words, the authorization effectively acts as a posted transaction.

25.     Sometime thereafter, the payment is processed, wherein the funds are actually transferred from the customer's account to the merchant's account.   This may occur several days after the transaction was initially initiated.

26.     There is no change—no impact whatsoever—to the available balance when posting or payment of a transaction that settles in the same amount for which it authorized occurs.  That is because at posting available balance is not used at all, and because available balance amounts do not change for transactions that settle in the same amount for which they were authorized.

**B.  In 2010, For the First Time, Bank of America Distinguished Between "One-Time" and "Recurring" Debit Card Transactions, But Failed to Inform Consumers of the Overdraft Fee Distinctions Engendered by the Newly-Minted Distinction**

27.     In 2010, Regulation E barred the assessment of overdraft fees on debit card transactions initially authorized into a positive available balance—the very type of transaction at issue in this lawsuit.

28.     However, prior to the effective date of the regulation, Bank of America discovered what it believed to be a loophole in the regulation.  Bank of America decided to continue to charge overdraft fees on debit card transactions that it concluded were "recurring"— that is transactions which occurred in regular intervals, usually to pay consumer bills like utilities, insurance, and membership fees.  In short, BofA for the first time adopted a radical distinction between two types of debit card transactions—one-time (which were protected from overdraft fees, even if authorized into a positive available balance) and recurring (without that protection).

29.     The complicated distinction between the two types of debit card transactions had never been made before.   Based on consumer complaints and consumer research, BofA understood full we that it would be confusing to consumers to distinguish between two types of debit card transactions.

30.     But BofA made the distinction anyway, exclusively to maintain an overdraft fee

revenue source that was being threatened by federal regulation.  There is no cogent reason for treating different debit card transactions differently, nor is there a consumer benefit to doing so.

31.     BofA's decision maximized revenues for the Bank in two ways.

32.      First, this revenue-maximizing decision allowed the bank to do two things with respect to recurring debit card transactions that it did <u>not</u> do with one-time debit card transactions:  (a) authorize them into a negative balance at the start, and charge an overdraft fee on them when they settled; (b) authorize them when they had a *positive* available balance at the start, then still charge overdraft fees on them at settlement, if intervening transactions depleted an account balance (the APPSN Transactions).

33.     Second, it allowed BofA to manufacture overdraft fees on other, later transactions—both one-time and recurring.  Here's how.  Each consumer was issued an overdraft protection amount by BofA—the amount BofA would knowingly allow an account to be overdrawn.  Based on that overdraft protection, BofA would authorize later transactions that it *knew* were likely to cause earlier transactions authorized into positive funds to incur overdraft fees at settlement.

34.     With respect to one-time debit transactions and/or ATM transactions on certain accounts, and recurring debit card transactions on other accounts, BofA therefore knowingly authorized transactions that were likely to cause overdraft fees on earlier-in-time transactions that had already been authorized into positive available funds.

35.     The Bank knew the revenue-maximizing distinction between one-time and recurring transactions was and would be poorly understood by its accountholders, but it made the distinction anyway.  It did so even as, publicly, the Bank was touting—through a massive media effort—its supposedly pro-consumer decision not to charge overdraft fees on debit card

transactions.  According to a CNN article from 2010, just before the recurring/non-recurring

debit transaction distinction went into effect, "Bank of America said Wednesday that it plans to

ditch overdraft fees on debit card purchases this summer."[2]

36.     That was not true.  BofA, in fact, continued to charge overdraft fees on *recurring*

debit card transactions in many different circumstances.

37.     Susan Faulkner, an executive at BofA, was quoted in the CNN article as saying:

"Our customers have been clear that they want to know if a purchase is going to overdraw their

account."  As Ms. Faulkner clearly understood, consumers understand and expect that if they

have sufficient funds in an account when a transaction is made, and a debit hold is placed on

those funds, the Bank will not *later* charge an overdraft fee on that same transaction.

38.     Around the same time, a New York Times article stated:  "In a move that could

bring an end to the $40 cup of coffee, Bank of America said on Tuesday that it was doing away

with overdraft fees on purchases made with debit cards[.]"[3]  Again, that statement is simply

false.  BofA continued charging overdraft fees on *recurring* debit card transactions.  And that

false statement was not due to journalistic error.  Faulkner was quoted in the New York Times

piece as well: "What our customers kept telling me is 'just don't let me spend money that I don't

have'…*We wanted to help them avoid those unexpected overdraft fees"* (emphasis added).  Yet

there is no fee more "unexpected" than one charged on a transaction authorized into a positive

available balance.

39.     In short, despite its public, pro-consumer pronouncements in 2010, the Bank

chose a path that side-stepped its consumer-friendly promises.  The Bank chose to allow

*recurring* debit card transactions to incur fees—even when authorized into a positive balance—

---

and it chose to allow one-time debit transactions to increase the number of overdraft fees caused on *other* types of transactions.  The Bank didn't "end" overdraft fees on debit card transactions, contrary to the message of its press junket.  Rather, it simply shifted a huge number of overdraft fees onto the newly-created category of "recurring" debit card transactions—all the while touting its supposedly generous decision to remove overdraft fees on debit card transactions.

40.     It never told the press this, and it never told consumers this in contract documents.

41.     The massive difference between the two types of debit card transactions included the following:  recurring transactions could be authorized even if the consumer lacked sufficient funds, whereas one-time transactions normally could not.

42.     Moreover, one-time APPSN Transactions were <u>not</u> charged an overdraft fee, while recurring APPSN Transactions <u>were</u> charged overdraft fees.  Although both one-time and recurring transactions were mentioned in the contract documents, those documents do not explain that the different transactions are treated differently in this respect.

43.     By drafting a contract that failed to distinguish the different overdraft fee policy applicable to the two different types of debit card transactions that it had just invented, the Bank breached the contract—and deceived consumers—when it charged huge numbers of overdraft fees on one subset of debit card transactions but not the other subset.

44.     Specifically, the 2012 version of the Deposit Agreement drew a distinction between one-time and recurring transaction, but never specifically discussed the important distinction regarding APPSN Transactions of both types, and does not disclose that recurring debit card transactions are treated differently for purposes of overdraft fees:

> With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions.  This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you

may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction.

[….]

[W]e may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments.

Ex. A, December 2012 Deposit Agreement, at 12.[4]

45.     While the contract states the Bank may "authorize" overdraft transactions, it never states that it will charge overdraft fees on transactions that were not "overdraft" transactions *when authorized*.  The contract thus only authorized the Bank to charge overdraft fees on recurring debit transactions it authorized into a negative balance from the start.  It never discusses or authorizes the other crucial distinction between one-time and recurring transactions: fees on the APPSN Transactions at issue in this lawsuit.

**C.  BofA's Account Documents**

46.     Bodnar's checking account with BofA was, at all relevant times, governed by BofA's standardized contract for deposit accounts, the material terms of which are drafted by BofA, amended by BofA from time to time at its convenience and complete discretion, and imposed by BofA on all of its customers.

47.     In June, 2010, near the time the changes to overdraft policies discussed *supra* were implemented, Bank of America issued a new Deposit Agreement.  That document contained the following relevant provisions:

OVERDRAFT AND DECLINED OR RETURNED ITEMS

---

[4] In addition to the December 2012 Deposit Agreement, Plaintiff additionally attaches as Exhibit B the Personal Schedule of Fees, dated July 16, 2012.

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item.  If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account…we transfer funds to cover the item.  Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).

[….]

Sometimes funds in your account are not available to cover your checks and other items.  When we determine that funds in your account are subject to a hold, dispute, or legal process, then these funds are not available to cover your checks and other items.  We usually make this determination once at the end of the day when we process items.  As examples of holds, holds include deposit holds, holds related to cash withdrawals, and authorization holds we place on the account for debit card transactions.

OVERDRAFT PRACTICES AND SETTINGS

With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. There is an exception for some ATM withdrawals. We may occasionally give you the opportunity at our ATMs to agree to our overdraft practices for a specific ATM withdrawal and, if you agree, we authorize and pay that ATM withdrawal. Please note that overdraft fees can apply to these withdrawals. We tell you at our ATM when this is available. . . .

[….]

With either overdraft setting, your account might still become overdrawn.  Here is an example of how that could occur.  You want to use your debit card to make a purchase and a merchant asks us to authorize the transaction.  We authorize the transaction because we determine you have enough available funds in your account at this time.  However, we do not receive the debit card transaction from the merchant for processing and posting to your account that day.  We do receive another transaction (such as a check you previously wrote) that we process and post that day and that other transaction reduces the available funds in your account below the amount of the debit card transaction.  This means, unless you promptly transfer or

deposit enough available funds, when we receive the debit card transaction, it will overdraw your account.

PAYING CHECKS AND OTHER ITEMS

We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, or on the day we receive notice that the item has been deposited for collection at another financial institution—whichever is earlier.  If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We may determine your balance and make our decision on an insufficient funds item at any time between our receipt of the item or notice and the time we must return the item.  We are required to determine your account balance only once during this time period.

Ex. A, December 2012 Deposit Agreement, at 11-13, 21-22.[5]

48.     The critical, and repeatedly used, contract term "to cover" is never defined, nor

are the terms "available funds" or "funds are not available."

49.     The Deposit Agreement was amended in May, 2014—one month before the

instant litigation commenced—to add the following new language:

We generally determine at the time we post a debit to your account whether it     creates an overdraft and whether an overdraft or returned item fee applies.  You should note that sometimes we authorize a transaction at a time when you have enough available funds to cover it, but because other transactions post before it and reduce your balance, the transaction creates an overdraft when we post it to your account.  You can avoid fees for overdrafts and returned items by making sure that your account always contains enough available funds to cover all of your transactions.  When your account balance includes some funds that are subject to a hold…you should note that those funds are not available to cover your transactions.

When your account balance includes some funds that are not available at the time we post a debit, and you do not have enough available funds in your account to cover the debit, the debit results in an overdraft and we generally charge you an overdraft item fee or returned item fee for the debit.  You

---

[5] Although the 2012 Deposit Agreement is primarily referenced in this complaint, the quoted language first appeared in the June 2010 version of the document. Ex. C, June 2010 Deposit Agreement, at 11-13, 22.  In addition to the June 2010 Deposit Agreement, Plaintiff additionally attaches as Exhibit D the Personal Schedule of Fees, dated June 29, 2010.

should know that we do not show holds, or distinguish between available and unavailable funds in your account balance, on your statement so when you review your statement later, it might appear that you had enough available funds in your account to cover a debit for which we charged you a fee.

Ex. E, May 2014 Deposit Agreement, at 16.[6]

50.     BofA also drafted and imposed on accountholders a document entitled "Important Information About Your Card Agreement and Disclosure," dated October, 2009.  That document states, in relevant part:

> Point of Sale Purchases With Your Card
>
> When we approve a request from a merchant or other financial institution to authorize a transaction you conduct with your Card, we may place a hold on your account.  The hold reduces the available balance in your account by the amount listed in the request.
>
> Since the hold reduces the available balance in your account, your remaining available balance must be sufficient to cover checks and other items that post to your account (such as in-person and ATM withdrawals, electronic funds transfers, and other debits) or, you may incur fees for overdrafts or returned items.
>
> In most cases the hold expires when the transaction posts to your account or three business days after the request, whichever occurs first.  When the hold expires, the amount being held is added to your available balance.  The amount is not applied to a specific transaction.  Please note that placing these holds reduces the available balance in your account and removing these holds increases the available balance in your account.
>
> Overdrafts and Unposted Transactions
>
> When you do not have enough available funds in your account…to cover a transaction, we consider the transaction an insufficient funds item.  We may either return the transaction unpaid or complete it and overdraw your account.  In either case, we may charge you an insufficient funds fee.  Your available balance may be reduced by any holds placed on your account as a result of pre-authorization requests from merchants or other financial institutions.

---

[6] In addition to the May 2014 Deposit Agreement, Plaintiff additionally attaches as Exhibit F the Personal Schedule of Fees, dated May 16, 2014.

Ex. G, Important Information About Your Card Agreement and Disclosure, October 15, 2009, ¶¶ 4, 7.

51.     In July, 2014—four years after the 2010 overdraft policy changes discussed above—Bank of America slightly modified the Card Agreement.  The bolded provisions were new:

> When we approve a request from a merchant or other financial institution to authorize a transaction you conduct with your Card, we may place a hold **on the funds**.  The hold reduces the available balance in your account by the amount stated in the request.  Because the hold reduces the available balance in your account, your remaining available balance must be sufficient to cover checks and other items that post to your account . . . **or, you may incur fees for overdrafts or items we decline or return unpaid**.  In most cases the hold expires when the transaction posts to your account or three business days after the request, whichever occurs first.  When the hold expires, the amount being held is added to **or subtracted from** your available balance.  Please note that placing these holds reduces the available balance in your account and removing these holds **either increases or decreases** the available balance in your account.
>
> Overdrafts and Unposted Transactions
>
> **When you do not have enough available funds in your account…to cover everyday non-recurring debit card purchases or ATM withdrawals, we will decline the transaction and you will not be subject to overdraft fees.  For checks, ACH, recurring debit card transactions and online bill payments, we may decline or return the transaction unpaid or we may complete it and overdraw your account.**

Ex. H, Important Information Brochure: Card Agreement and Disclosure, April 1, 2013, ¶¶ 4b, 7.[7]

52.     No express language in any document states that the Bank may impose fees for overdrafts on recurring debits that post into a positive available balance and then are settled against a purportedly negative balance.

---

[7] The Bank further modified this document in July of 2014, but any modifications to the substance of the 2013 provisions discussed herein were purely cosmetic.  Ex. I, Important Information Brochure: Card Agreement and Disclosure, July 1, 2014, ¶¶ 4b, 7 (emphasis added).

**D. The Account Documents Fundamentally Misconstrue the Bank's True Overdraft Fee and Debit Processing Practices**

53.     The Account Documents misconstrue the Bank's true debit card processing and overdraft fee practices in at least six ways.

54.     <u>First</u>, and most fundamentally, the Bank charges overdraft fees on debit card transactions for which there are sufficient available funds to "cover" the transactions.   That is despite repeated contractual representations that the Bank will <u>only</u> charge overdraft fees on transactions with insufficient available funds to "cover" a given transaction.

55.     The Bank assesses overdraft fees on APPSN Transactions that ***do*** have sufficient available funds to "cover" them throughout their lifecycle.

56.     Those held funds (also called memo debited funds) are placed off-limits for <u>any other use</u> by consumers during the pendency of the hold.

57.     To the extent intervening transactions are authorized or paid on an account, those intervening transactions are not paid or authorized with the held funds, but are rather paid with other funds, including overdraft protection funds provided by the Bank.

58.     Additions to its May 2014 Deposit Agreement bolster this understanding. The Bank instructs its customers:

> You can avoid fees for overdrafts and returned items by making sure that your account always **contains enough available funds** to cover all of your transactions.  When your account balance includes some funds that are subject to a hold . . . **you should note that those funds are not available to cover your transactions . . .**

Ex. E, May 2014 Deposit Agreement, at 16.

59.     That is precisely the point.  The held funds are not "available" to "cover" *subsequent* transactions—because those held funds are "covering" the transactions they were being held for.

60. The Bank's practice of charging overdraft fees even where sufficient available funds exist to "cover" a transaction violates a contractual promise not to do so. This discrepancy between the Bank's actual practice and the contract causes consumers like Bodnar to incur more overdraft fees than they should.

61. The funds are supposedly "held," throughout the life cycle of a debit card transaction, to cover the transaction. As such, the transaction should never post into a negative balance. Those funds are supposed to cover that transaction. When the Bank allows those funds to be depleted—instead of applying them to the authorized debit—it is breaching its promise to the customer that the funds are being set aside for the original debit.

62. <u>Second</u>, the account documents repeatedly state that overdraft assessments are based on available funds or "funds available" (in the Deposit Agreement) or "available balance" (in the Card Agreement). But in reality, the Bank does <u>not</u> even use an available funds calculation or "available balance" to determine whether transactions are eligible for overdraft fees—it uses a different, secret "processing" balance to do so.

63. In actuality, the Bank maintains two separate and simultaneous transaction systems—plus a third system that is used to assess overdraft fees.

64. The "intraday" transaction processing system maintains an account's available balance in real time, increasing and decreasing during the day based on an accountholder's activity.

65. Available balances are maintained only in the intraday processing system.

66. Overdraft fee determinations are not made within the intraday processing system.

67. The second transaction processing system is the "nightly batch processing" system. It is in this system that transaction posting and settlement actually occurs.

68.     The Bank then uses a third system to make overdraft fee determinations.  At the end of nightly batch processing, certain transactions are designated as potentially eligible for overdraft fees. The third system then applies a complicated algorithm to assess overdraft fees on certain transactions that had previously been designated as "overdrawn."

69.     Not all transactions that are supposedly "overdrawn" incur an overdraft fee.  That determination is made in the third system.    Indeed, numerous transactions are considered "overdrawn" by the nightly batch processing system but are nonetheless not charged an overdraft fee.

70.     With respect to the intraday available balance, "sufficient" funds for APPSN Transactions have already been debited from the account via a debit hold.  At the time of settlement, then, an intraday available balance *does not change at all* for these transactions previously authorized into good funds.  (As such, BofA cannot then charge an overdraft fee on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.)

71.     This entire posting process is misconstrued in the Card Agreement, which states that:  "When the hold expires, the amount being held is added to or subtracted from your available balance.  The amount is not applied to a specific transaction.  Please note that placing these holds reduces the available balance in your account and removing these holds increases the available balance in your account."  Ex. H, Important Information Brochure: Card Agreement and Disclosure, April 1, 2013, ¶ 4b.

72.     Each of the three sentences quoted in the preceding paragraph misstates the Bank's true practices.

73.     "When the hold expires, the amount being held is added to your available balance" is false because "available balance" is not even used in the batch processing system; because holds do not expire in the intraday processing system; and because the "amount being" held is never actually "added" to or "subtracted" from the available balance—indeed, for APPSN Transactions, the available balance does not change at all at settlement.

74.     "The [held] amount is not applied to a specific transaction" is false for all the reasons discussed *supra*—held funds are, in actuality, inextricably tied to the specific transactions which engendered them.

75.     And "placing these holds reduces the available balance in your account and removing these holds increases the available balance in your account" is false because, again, available balance is not used at all during nightly batch processing.  Moreover, removal of holds only occurs during nightly batch processing (which again, does not use an available balance or funds calculation).  Lastly, placing holds only occurs in the intraday processing system, not the nightly batch processing system.

76.     When the Bank uses a balance *other* than available balance or funds available—a secret processing balance—to assess overdraft fees, it violates a contractual promise to use available balance or an available fund calculation as the exclusive method with which to determine whether overdraft fees will be assessed.

77.     This discrepancy between the Bank's actual practice and the contract causes consumers to incur more overdraft fees than they should.

78.     Third, the Bank designates held funds for *specific* debit card transactions.  Debit holds (or memo debits) are associated exclusively with the debit card transaction that engendered

them, and that exclusively associated is maintained throughout the life of the transaction, from authorization to settlement.

79.     The Card Agreement thus misstates the Bank's true process when it states that "[t]he [debit hold] amount is not applied to a specific transaction."

80.     This discrepancy between the Bank's actual practice and the contract allows the Bank to charge overdraft fees *after* transactions have posted, causing consumers to incur more overdraft fees than they should.

81.     By employing the fiction that holds "are not applied to a specific transaction," BofA attempts to justify the *post facto* assessment of additional overdraft fees on APPSN Transactions for which sufficient available funds were always available to "cover" those transactions.

82.     Fourth, the Bank's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and at the time of settlement.  (Indeed, some transactions never make it past the starting gate and are declined at the point of sale, precisely because at that assessment they are overdrawn and because BofA makes a determination at authorization.)  Then the Bank makes that determination again, at settlement.

83.     The contract, to the contrary, explains that only one assay takes place: "[w]hen we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item."

84.     The Bank's practice of assaying the same transaction twice violates a contractual promise not to do so.  This discrepancy between the Bank's actual practice and the contract causes consumers to incur more overdraft fees than they should.

85.     <u>Fifth,</u> intervening transactions cannot and do not actually "reduce[] the available funds in your account below the amount of the debit card transaction," as stated in the Deposit Agreement.  This provision misstates the Bank's true processing practices.  In fact, intervening transactions are <u>never</u> paid with held funds—rather they are paid with other funds, such as remaining available funds or funds provided separately through the Bank's overdraft protection program.

86.     Accordingly, it is impossible for the "other transactions" on "that day" to reduce available funds "below the amount of the debit card transaction."  An intervening transaction can reduce available funds in the account below the amount of the new (second) transactions, but they cannot reduce funds below the amount of the first transaction because that reduction has already taken place.

87.     In short, a debit hold's funds are in some ways sacrosanct—designated for authorized transactions, the debit hold funds cannot be used to pay other transactions.  To the extent the Bank does authorize or pay other transactions, it actually does so with other funds.

88.     Accordingly, held funds cannot have been depleted by other transactions by the time of settlement, contrary to the representation made in the account documents.

89.     This discrepancy between the Bank's actual practice and the contract represents a failed attempt by BofA to allow the Bank to charge more overdraft fees after transactions have already posted, causing consumers to incur more overdraft fees than they should.

90.     By employing the fiction that other transactions" on "that day" can reduce available funds "below the amount of the debit card transaction," BofA provides a false explanation for how the customer incurred additional overdraft fees.

91.     <u>Sixth</u>, the bank actually debits the same transactions twice, in two different systems—the intraday system and then again in the nightly batch processing system.  But this practice is contrary to contract language that states it will only make one such debit: "We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, ***or*** on the day we receive notice that the item has been deposited for collection at another financial institution—whichever is earlier." Ex. A, December 2012 Deposit Agreement, at 21 (emphasis added). The Deposit Agreement also states elsewhere that BofA makes just *one* debit per transaction.  *Id.* at 21-22 ("We are required to determine your account balance only once during this time period.").

92.     The Bank's practice of assaying the same transaction twice violates a contractual promise not to do so.  This discrepancy between the Bank's actual practice and the contract causes consumers to incur more overdraft fees than they should.

93.     In sum, there is a yawning gap between the Bank's practices as described in the account documents and the Bank's practices in reality.

**E.  The Bank Abuses Contractual Discretion**

94.     The Bank's treatment of recurring debit card transactions to charge overdraft fees is not simply a breach of the express terms of the numerous account documents.  In addition, Bank of America exploits contractual discretion to the detriment of accountholders when it uses these policies.

95.     <u>First</u>, the Bank enjoys a huge amount of discretion in how to calculate the central term in this litigation: available funds or available balance.  Those terms are not defined in the contracts—though the terms "Collected Balance," "End of Day Balance," and "Ledger Balance"

are defined.  BofA uses its contractual discretion to set the meaning of that term to choose a meaning that directly causes more overdraft fees.

96.    Second, the term "to cover" a transaction is similarly undefined:  "You can avoid fees for overdrafts…by making sure that your account always contains **sufficient available funds to cover** all of your transactions." Ex. A, December 2012 Deposit Agreement, at 11.  The Bank uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term.  In the Bank's definition, a transaction is not "covered" even if the Bank sequesters sufficient available funds for that transaction.

97.    Third, the Bank maintains discretion to selectively charge overdraft fees on certain transactions it considers "overdrawn," but not others.  It uses that discretion to charge overdraft fees on APPSN Transactions that no reasonable consumer would believe could cause overdraft fees—because those transactions were authorized into positive available funds, and as discussed below, BofA's own consumer research and quotes from Susan Faulkner indicate that consumers understand checking accounts are debited immediately for debit card transactions.

98.    Fourth, the Bank maintains discretion to selectively charge overdraft fees on certain transactions it considers "overdrawn," but not others.  BofA exploits this discretion to charge overdraft fees on all supposedly overdrawn recurring debit card transactions, including APPSN Transactions.

99.    Fifth, the Bank uses its contractual discretion to "determine" whether a transaction has sufficient available funds more than once, so that transactions already "determined" once to have sufficient funds can be tested again:  "**When we determine** that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item . . . [W]e either authorize or pay the

insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).  **We pay overdrafts at our discretion**."  Ex. A, December 2012 Deposit Agreement, at 11-12 (emphasis added).

100.    Sixth, in the Card Agreement, BofA uses its discretion to define the meaning of a "hold" in a way that increases overdraft fees.  The Bank informs the customers that it has the discretion to decide whether to place a hold on funds at the time of posting:  "When we approve a request from a merchant or other financial institution to authorize a transaction you conduct with your Card, **we may place a hold** on the funds."  Ex. H, Important Information Brochure: Card Agreement and Disclosure, April 1, 2013, ¶ 4b (emphasis added).  It does not define what "hold" means.  Not only does the Bank use its discretion to apply a hold each and every time, but it uses its discretion to define "hold" in a farcical, unreasonable manner. The "hold" that Bank applies results in sequestration of funds, including denial of customer access to funds, but then does not actually use those funds to "cover" the transaction when it settles.

101.    Seventh, the Bank reserves for itself contractual discretion regarding posting order of debit card transactions:  **"We may determine in our discretion the order that we process and post credits, debits and holds to your account."**  Ex. A, December 2012 Deposit Agreement, at 14 (emphasis added).  With respect to "posting," BofA uses a secret, undisclosed policy during nightly batch processing that maximizes the impact of holds on overdraft fees.  Of the myriad possibilities for how to order debits and holds during nightly batch processing, BofA chooses the one that maximizes overdraft fees on APPSN Transactions.

102.    BofA uses all of these contractual discretion points unfairly to extract overdraft fees on transactions that no reasonable consumer would believe could cause overdraft fees.

**F. By Employing Practices That Assessed Overdraft Fees Based on Non-Chronological Transaction Ordering, The Bank Used a Policy That Contradicted the Bank's Own Consumer Research**

103.     The assessment of overdraft fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

104.     BofA was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

105.     BofA was aware that consumers understand debit card transactions result in the immediate debit of funds from checking accounts.  Indeed, BofA issued at least one marketing pamphlet that made that promise explicit.

106.     In short, consumers understand debit card authorizations to effectively act as a posted transaction.

107.     BofA conducted extensive consumer research on how consumers understand the operation of debit card transactions, including the meaning of account balances.  The Bank's own consumer research indicated that consumers understand funds for debit card transactions to be debited immediately.

108.     The Bank understood that "retroactive" application of overdraft fees was inconsistent with consumer understanding.

109.     BofA was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the order the transactions are actually initiated.

110.    The Bank provided marketing pamphlets and other representations to consumers that promised them debit card transaction amounts were deducted "immediately" from accounts.

111.    In sum, the bank knew full well that consumers understood debits to be deducted immediately, *one time*, and that consumers would thus interpret the contract in a fashion consistent with immediate debit.

112.    Because BofA heard repeated complaints from consumers about confusion regarding their balances and overdraft fees, the Bank undertook a project to convey to consumers, via an available balance, how much money they could purportedly spend without incurring an overdraft fee.  In short, the Bank understood consumers expect available funds to be deducted immediately.

**G.  The Bank Double-Counts Certain APPSN Transactions**

113.    In addition to the practices described above, BofA double counts certain APPSN Transactions—charging overdraft fees on them at the same time as it uses the holds associated APPSN Transactions to cause *other* transactions to incur overdraft fees.

114.    BofA manages to manufacture a circumstance in which *one* debit hold transaction (1) first contributes to an overdraft fee on an intervening transaction before (2) incurring an overdraft fee of its own when the hold is credited to and re-debited from the account at the time of settlement.

115.    BofA itself acknowledges such a pattern is unfair and unjustified.  Recently, the Bank adopted a policy to forgive certain of these fees under a policy it calls the "problem item" policy.  Unfortunately, the "problem item" policy has been incompletely executed—and numerous overdraft fees continue to be assessed on transactions as a result of double counting.

116.     There are a few permutations, and each is a shocking, overdraft fee-maximizing manipulation:

Double-Counting Permutation #1

117.     BofA authorizes recurring debit card purchase into positive checking account balance.

118.     BofA immediately places a debit hold and reduces the account's "available balance" by the amount of the authorized purchase.

119.     During the days-long interval between the time the debit card purchase is authorized by BofA and the time it "settles," BofA posts *other* transactions to the account.

120.     BofA charges overdraft fees on those *other* transactions when the account balance, which has already been reduced by the amount of the original debit card transaction, is insufficient to fully cover those transactions.

121.     BofA charges overdraft fees to the account immediately, *further* reducing the available balance in the amount of $35 per overdraft fee.

122.     Then, when the first transaction "settles," the Bank charges yet another overdraft fee on the transaction, even though it had already set aside money to pay that transaction—and even where the only reason the transaction is considered "overdrawn" is because of overdraft fees its own hold caused.

123.     Indeed, instead of using the set-aside money to pay the original debit card transactions, Bank of America uses the set-aside money *to pay itself back for overdraft fees it charges on the intervening transactions—then charges an overdraft fee on the original transaction for a purported lack of sufficient funds.*

124.    In short, the first transaction is only considered "overdraft" because of the overdraft fee its own "hold" caused, and BofA simply used the re-credited "hold" money to re-pay itself for the intervening overdraft fee prior to charging an overdraft fee on a transaction that it had initially authorized into an available balance.  This exact scenario befell Bodnar.

125.    On 1/28/2013 and 1/29/2013, BofA charged Bodnar a total of three overdraft fees—at least one too many.

126.    On 1/28/2013, an ATM and an ACH transaction came into post, and in both cases, the ledger balance was positive, but the available balance was negative.  The ATM transaction did not result in a fee due to an unrelated Bank policy, but BofA charged an overdraft fee on the $30 ACH transaction.  That overdraft determination resulted in an overdraft fee, which then immediately reduced Bodnar's available balance by a further $35.

127.    Importantly, the only reason the bank charged an overdraft fee on the ACH transaction is because of two debit "holds" it had placed previously, which reduced the available balance by $180 and $29.99, respectively.  Those debit holds were in place at the time of the ATM and ACH transactions, leaving a depleted available balance for subsequent transactions.

128.    Then, on 1/29/2013, both the $180.00 and the $29.99 charges settled.  In addition, a third debit charge, also for $29.99, also settled.  Due to an intervening $90 credit that Bodnar made, the $180.00 did not post to a negative available balance, and no overdraft fee was charged. However, BofA *did* charge an overdraft fee on the $29.99 debit for which a hold was previously in place—even though it had placed funds on hold for that amount at the time of initiation, and even though that hold had contributed to the overdraft fee on the ACH transaction on 1/28.

129.    The only reason the $29.99 debit incurred an overdraft fee at all is because of the $35 overdraft fee from the day before.  Without that overdraft fee, there would still have been

positive available funds at the time of settlement, even after BofA's other machinations.  And that $35 overdraft fee was charged (on the ACH transaction) because the $29.99 debit hold contributed to the lowered available balance.

130.    In other words, at least one of the 1/29/2013 transactions for $29.99 was subject to an overdraft fee *only because* the available balance on that day had been reduced by a different overdraft fee that posted earlier.  And that overdraft fee that posted earlier was only incurred because of the debit holds in place on the prior day.  In this way, *BofA charges overdraft fees on overdraft fees*.  The example reveals that BofA uses the available balance in order to manufacture overdraft fees, which is turn decimates the available balance for transactions posting subsequently.  So even when—as happened here—Bodnar put $90 in real money into her account to make up for a slight overdraw, a huge chunk of that money was eaten up by an overdraft fee.  In short, BofA did everything it could to prevent her from curing her small, $12 mistake.

Double-Counting Permutation #2

131.    An accountholder makes a recurring debit card purchase, which BofA authorizes into a positive available balance.  (In other words, there are sufficient available funds to cover that purchase in full at the time it is made.)

132.    Before that item "settles," another debit card transaction is authorized, but does not settle, reducing the available balance below zero.

133.    When the <u>first</u> transaction then settles, BofA charges an overdraft fee on it—even though it had set aside funds to pay that transaction via a hold, and even though the available balance on that transaction did not change at the time of settlement.

134.    Then, when the second transaction settles later, it also is subjected to an overdraft fee.

**H. Bodnar's Experience**

135.    Bodnar was assessed four overdraft fees on May 29, 2013, for transactions that were posted to her account on May 28, 2013, despite her account having a positive ledger balance at all times on May 28, 2013.

136.    Thus, Bodnar's account was assessed overdraft fees due to a negative "available balance," created as a result of "holds" on transactions that were authorized and approved on or before May 28, 2013, but that had not yet settled to Bodnar's account.

137.    Then, on May 29, 2013, the following three transactions, which were authorized prior to May 29, 2013, settled to Bodnar's account: (1) $180.00 debit card purchase authorized on May 28, 2013; (2) $29.99 debit card transaction authorized on May 28, 2013; and (3) $9.40 debit card transaction authorized on May 27, 2013.   Each of these transactions had been authorized and approved into a sufficient available balance.

138.    BofA placed holds in the total amount of the three transactions ($219.39).   On May 28, that had the effect of reducing Bodnar's "available balance" by that same amount.   The reduction in Bodnar's available balance by the amount of the held transactions resulted in overdraft fees for the recurring debit card transactions, ACH transactions, and check transaction (all transactions other than one-time debit card transactions) that settled on May 28, 2013.

139.    Indeed, without these three holds, Bodnar's account would have had a sufficient available balance to pay *all* transactions that settled on May 28, 2013, and therefore, her account would not have been assessed *any* overdraft fees on May 29, 2013.   Instead, pursuant to its

overdraft policy, BofA charged the maximum *four* overdraft fees on the above eligible transactions.

140.    But BofA did not stop there.  On May 30, 2013, BofA assessed overdraft fees for two of three held transactions that settled on May 29, 2013.  Thus, BofA charged overdraft fees on the very same transactions that were authorized and approved into sufficient available balances and that it had used to reduce Bodnar's available balance on May 28, 2013, which in turn, contributed to the assessment of four overdraft fees on that date.

141.    BofA assessed overdraft fees on the held transactions even though it had sequestered available funds for those transactions at the time they were authorized.

## CLASS ALLEGATIONS

142.    Bodnar brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

143.    The proposed classes are defined as:

> All Bank of America checking account holders in the United States who, from May 25, 2011, through the date of class certification, were charged overdraft fees on transactions that were authorized into a positive available balance (the "National Class").

> All Bank of America checking account holders in Pennsylvania who, from May 25, 2011, through the date of class certification, were charged overdraft fees on transactions that were authorized into a positive available balance (the "Pennsylvania Sub-Class").

> All Bank of America checking account holders in the United States who, from May 25, 2011, through the date of class certification, were charged overdraft fees on transactions that were authorized into a positive available balance, and those same transactions also contributed to overdraft fees for subsequent transactions (the "National Double-Counting Class").

> All Bank of America checking account holders in Pennsylvania who, from May 25, 2011, through the date of class certification, were charged overdraft

fees on transactions that were authorized into a positive available balance, and those same transactions also contributed to overdraft fees for subsequent transactions (the "Pennsylvania Double-Counting Sub-Class").

The National Classes and the Pennsylvania Subclasses are collectively referred to as the "Classes."

144.    The above Classes expressly exclude all claims released by the Settlement Agreement and Release in the actions titled: *Tornes, et al. v. Bamk of America, N.A.*, S.D. Fla. Case. No. 1:08-cv-23323-JLK; *Yourke, et al. v. Bank of America, N.A.*, S.D. Fla. Case No. 1:09-cv-21963-JLK, N.D. Cal. Case No. 3:09-2186; and *Phillips, et al. v. Bank of America, N.A.*, S.D. Fla. Case No. 1:10-cv-24316-JLK, W.D. Okla. Case No. 5:10-cv-01185-R.

145.    Bodnar reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

146.    Excluded from the Classes are BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

147.    The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BofA's records.

148.    The claims of the representative Bodnar are typical of the claims of the Classes in that the representative Bodnar, like all Class members, was charged overdraft fees by BofA as a result of charging overdraft fees on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at the time the transactions were settled. The representative Bodnar, like all Class members, has been damaged by BofA's misconduct in

that they have been assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of BofA's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

149. There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

150. Among the questions of law and fact common to the Classes are whether BofA:

a. Imposed overdraft fees on recurring debit card transaction when those transactions were authorized into sufficient available balances or funds available;

b. Breached its covenant of good faith and fair dealing with Bodnar and other members of the Classes through its overdraft policies and practices on APPSN Transactions;

c. Converted money belonging to Bodnar and other members of the Classes through its overdraft policies and practices;

d. Was unjustly enriched through its overdraft policies and practices; and

e. Violated the consumer protection acts of certain states through its overdraft policies and practices.

1. Other questions of law and fact common to the Classes include:

f. The proper method or methods by which to measure damages, and

g. The declaratory relief to which the Classes are entitled.

151. Bodnar's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices of BofA's Account Agreement and other related documents. Bodnar has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

152. Bodnar is committed to the vigorous prosecution of this action and has retained

competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Bodnar is an adequate representative and will fairly and adequately protect the interests of the Classes.

153.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BofA, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and BofA's misconduct will proceed without remedy.

154.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

### FIRST CLAIM FOR RELIEF
#### Breach of Contract
#### (On Behalf of the Classes)

155.    Bodnar repeats and incorporates all allegations made above.

156.    Bodnar and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

157.     As alleged in greater detail above, the Bank misrepresented in the account documents its true debit card processing and overdraft fee practices and breached the express terms of the account documents.     Those breaches are summarized below, while also incorporating the other, more detailed, allegations of the express breach of contract.

158.     In plain, clear, and simple language, the checking account contract documents promise that the Bank will <u>only</u> charge overdraft fees on transactions with insufficient available funds to "cover" a given transaction.     Ex. A, December 2012 Deposit Agreement, at 11 (emphasis added).  The Bank breaches this plain contractual promise when it assesses overdraft fees on APPSN Transactions that **_do_** have sufficient available funds to "cover" them throughout their lifecycle.

159.     The Bank breached promises included in the account documents by:  making overdraft fee determinations on balances other than the "available" balance or funds available; assaying debit card transactions more than once to determine whether the transaction is overdrawn; and debiting an account in two different instances for the same transaction.

160.     The Bank misrepresented its actual practices when it stated that held funds are not applied to specific debit card transactions, and that intervening transactions can "reduce[] the available funds in your account below the amount of the debit card transaction."

161.     No contract provision authorizes BofA to charge overdraft fees on APPSN Transactions; to or to "double-count" debit card transactions for purposes of assessing overdraft fees.

162.     Therefore, BofA breached the terms of its account documents by charging overdraft fees on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at the time the transactions were settled.

163.    Bodnar and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account documents.Bodnar and members of the Classes have sustained damages as a result of BofA's breach of the account documents.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing
#### (On Behalf of the Classes)

164.    Bodnar repeats and incorporates all allegations made above.

165.    Bodnar and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

166.    Under the laws of the states where BofA does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

167.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

168.    BofA has breached the covenant of good faith and fair dealing in the Account Agreement through its overdraft policies and practices as alleged herein.  BofA harms consumers

36

by abusing its contractual discretion in a number of ways which no reasonable consumer would anticipate.  Those breaches are summarized below, while also incorporating the other, more detailed, allegations of the implied breach of contract.

169.   <u>First</u>, the Bank enjoys a huge amount of discretion in how to calculate the central term in this litigation: available funds or available balance.  Those terms are not defined in the contracts—though the terms "Collected Balance," "End of Day Balance," and "Ledger Balance" are defined.  BofA uses its contractual discretion to set the meaning of that term to choose a meaning that directly causes more overdraft fees.

170.   <u>Second</u>, the term "to cover" a transaction is similarly undefined:  "You can avoid fees for overdrafts…by making sure that your account always contains **sufficient available funds to cover** all of your transactions." Ex. A, December 2012 Deposit Agreement, at 11.  The Bank uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term.  In the Bank's definition, a transaction is not "covered" even if the Bank sequesters sufficient available funds for that transaction.

171.   <u>Third</u>, the Bank maintains discretion to selectively charge overdraft fees on certain transactions it considers "overdrawn," but not others.  It uses that discretion to charge overdraft fees on APPSN Transactions that no reasonable consumer would believe could cause overdraft fees—because those transactions were authorized into positive available funds, and as discussed below, BofA's own consumer research indicates that consumers understand checking accounts are debited immediately for debit card transactions.

172.   <u>Fourth,</u> the Bank maintains discretion to selectively charge overdraft fees on certain transactions it considers "overdrawn," but not others.  BofA exploit this discretion to

charge overdraft fees on all supposedly overdrawn recurring debit card transactions, including APPSN Transactions.

173.   <u>Fifth</u>, the Bank uses its contractual discretion to "determine" whether a transaction has sufficient available funds more than once, so that transactions already "determined" once to have sufficient funds can be tested again:  "**When we determine** that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item . . . [W]e either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).   **We pay overdrafts at our discretion**."  Ex. A, December 2012 Deposit Agreement, at 11-12 (emphasis added).

174.   <u>Sixth</u>, in the Card Agreement, BofA uses its discretion to define the meaning of a "hold" in a way that increases overdraft fees.  The Bank informs the customers that it has the discretion to decide whether to place a hold on funds at the time of posting:  "When we approve a request from a merchant or other financial institution to authorize a transaction you conduct with your Card, **we may place a hold** on the funds."  Ex. H, Important Information Brochure: Card Agreement and Disclosure, April 1, 2013, ¶ 4b (emphasis added).  Not only does the Bank use its discretion to apply a hold each and every time, but it uses its discretion to apply a type of "hold" that is a farce. The "hold" that Bank applies results in sequestration of funds, including denial of customer access to funds, but then does not actually use those funds to "cover" the transaction when it settles.

175.   <u>Seventh</u>, the Bank reserves for itself contractual discretion regarding posting order of debit card transactions:  **"We may determine in our discretion the order that we process and post credits, debits and holds to your account."**  Ex. A, December 2012 Deposit

Agreement, at 14 (emphasis added).  With respect to "posting," BofA uses a secret, undisclosed policy during nightly batch processing that maximizes the impact of holds on overdraft fees.  Of the myriad possibilities for how to order debits and holds during nightly batch processing, BofA chooses the one that maximizes overdraft fees:  it credits hold amounts, then immediately re-debits associated transactions.

176.   BofA uses all of these contractual discretion points to extract overdraft fees on transactions that no reasonable consumer would believe could cause overdraft fees.

177.   Bodnar and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account documents.

178.   Bodnar and members of the Classes have sustained damages as a result of BofA's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
#### Conversion
#### (On Behalf of the Classes)

179.   Bodnar repeats and incorporates all allegations made above.

180.   BofA had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

181.   BofA has wrongfully collected overdraft fees from Bodnar and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

182.   BofA has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Bodnar and the members of the Classes, without legal justification.

183.   BofA continues to retain these funds unlawfully without the consent of Bodnar or members of the Classes.

184.    BofA intends to permanently deprive Bodnar and the members of the Classes of these funds.

185.    These funds are properly owned by Bodnar and the members of the Classes, not BofA, which now claims that it is entitled to their ownership, contrary to the rights of Bodnar and the members of the Classes.

186.    Bodnar and the members of the Classes are entitled to the immediate possession of these funds.

187.    BofA has wrongfully converted these specific and readily identifiable funds.

188.    BofA's wrongful conduct is continuing.

189.    As a direct and proximate result of this wrongful conversion, Bodnar and the members of the Classes have suffered and continue to suffer damages.

190.    By reason of the foregoing, Bodnar and the members of the Classes are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
**(On Behalf of the Classes)**

191.    Bodnar repeats and incorporates all allegations made above.

192.    Bodnar alleges that the contract language discussed above does not directly address and govern all of the unjust conduct alleged herein.  Moreover, Bodnar alleges that the purported contract is unenforceable and illusory based on BofA's unlawful conduct, anticipatory breach, and misrepresentations contained within the purported contract.

193.    Therefore, in the alternative to her breach of contract claims, Bodnar, on behalf of herself and the Classes, asserts a common law claim for unjust enrichment.

194.     By means of BofA's wrongful conduct alleged herein, BofA knowingly provided banking services to Bodnar and members of the Classes that was unfair, unconscionable, and oppressive.

195.     BofA knowingly received and retained wrongful benefits and funds from Bodnar and members of the Classes.  In so doing, BofA acted with conscious disregard for the rights of Bodnar and members of the Classes.

196.     As a result of BofA's wrongful conduct as alleged herein, BofA has been unjustly enriched at the expense of, and to the detriment of, Bodnar and members of the Classes.

197.     BofA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

198.     Under the common law doctrine of unjust enrichment, it is inequitable for BofA to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Bodnar and members of the Classes in an unfair, unconscionable, and oppressive manner.  BofA's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

199.     The financial benefits derived by BofA rightfully belong to Bodnar and members of the Classes.  BofA should be compelled to disgorge in a common fund for the benefit of Bodnar and members of the Classes all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by BofA traceable to Bodnar and the members of the Classes.

200.     Bodnar and members of the Classes have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
## Pennsylvania's Unfair Trade Practices and Consumer Protection Law
### (On Behalf of the Pennsylvania State Subclasses)

201.     Bodnar repeats and incorporates all allegations made above.

202.     This claim is asserted on behalf of the members of the Pennsylvania Subclass under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), PA ST 73 P.S. § 201-1, *et seq.*

203.     BofA engaged in unfair and/or deceptive acts or practices relating to the imposition of overdraft fees on consumers, in violation of the UTPCPL, PA ST 73 P.S. § 201-1, *et seq.*

204.     The UTPCPL, PA ST 73 P.S. § 201-3 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

205.     PA ST 73 P.S. § 201-2(4)(xxi) defines "unfair methods of competition" and "unfair or deceptive acts or practices" as "engaging in any other fraudulent tor deceptive conduct which creates a likelihood of confusion or misunderstanding."

206.     Pursuant to PA ST 73 P.S. § 201-9.2, *et seq.*, Bodnar and members of the Pennsylvania Subclass purchased services, in the form of banking services, from BofA that were used primarily for personal, family or household purposes.

207.     BofA engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance, and misrepresenting and failing to disclose its policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance in its Account Agreement and related documents.

208.    BofA also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction, and misrepresenting and failing to disclose its policy and practice of using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction in its Account Agreement and related documents.

209.    BofA also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to BofA.

210.    BofA intended that Bodnar and the members of the Pennsylvania State Subclass rely on the acts of concealment and omissions, so that Bodnar and the members of the Pennsylvania State Subclass would continue to incur overdraft fees.

211.    BofA's conduct caused Bodnar and the members of the Pennsylvania State Subclass to suffer ascertainable losses in the form of excessive overdraft fees that, but for BofA's unfair and deceptive policy of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance and using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction, would not otherwise have been imposed.

212.    A causal relationship exists between BofA's unlawful conduct and the ascertainable losses suffered by Bodnar and the members of the Pennsylvania State Subclass. Had BofA charged overdraft fees on transactions only if they were approved and authorized into

43

an insufficient balance, and made only a single overdraft fee determination for each transaction, Bodnar and the members of the Pennsylvania State Subclass would not have incurred excessive overdraft fees in violation of the UTPCPL.

213.    As redress for BofA's repeated and ongoing violations of the UTPCPL, Bodnar and the Pennsylvania State Subclass are entitled to, *inter alia*, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Bodnar and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.      Declaring BofA's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.      Restitution of all overdraft fees paid to BofA by Bodnar and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by BofA from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements assessed by Bodnar in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated: August 24, 2015.

  /s/ James C. Shah
James C. Shah
**SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP**
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
jshah@sfmslaw.com

Hassan A. Zavareei (*pro hac vice*)
Jeffrey Kaliel (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

Jeffrey M. Ostrow (*pro hac vice* to be filed)
Jason H. Alperstein (*pro hac vice* to be filed)
**KOPELOWITZ OSTROW P.A.**
200 S.W. First Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
alperstein@kolawyers.com

*Counsel for Bodnar and the Proposed Classes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2015, I electronically filed the forgoing document with the Clerk of the Court using the CM/ECF system, which will cause a true and correct copy to be served via e-mail on all ECF-registered counsel of record.

/s/ Hassan A. Zavareei
Hassan A. Zavareei