## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

SHERRY L. BODNAR, on Behalf of herself
and All Others Similarly Situated,

     Plaintiff,

     vs.

BANK OF AMERICA, N.A.,

     Defendant.

Case No. 5:14-cv-03224-EGS

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION
## FOR CERTIFICATION OF A SETTLEMENT CLASS AND
## <u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 1

II.    BACKGROUND ................................................................................................... 2

III.   DISSEMINATION OF NOTICE HAS BEEN SUCCESSFUL ............................................. 3

IV.    THE COURT SHOULD FINALLY APPROVE THE SETTLEMENT ............................... 6

    A.     The Proposed Settlement is Presumptively Fair Because It Is a
        Result of Vigorous, Informed, Arm's Length Negotiations. ....................... 7

    B.     Examination of the *Girsh* Factors Supports Approval of the Settlement ..................... 9

        1.     The Complexity, Expense, and Likely Duration of the Litigation
            Weigh in Favor of Final Approval ............................................................. 9

        2.     The Reaction of the Class to the Settlement ........................................... 11

        3.     The Stage of the Proceedings Weighs in Favor of Final Approval ....................... 12

        4.     The Risks of Establishing Liability and Damages Weigh in Favor of
            Final Approval ....................................................................................... 13

        5.     The Risks of Maintaining the Class Action and Class Certification
            Through Trial Weigh in Favor of Approval ............................................. 14

        6.     The Ability of Defendants to Withstand a Greater Judgment ............................... 16

        7.     The Settlement is Reasonable in Light of All of the Attendant Risks
            of Litigation .......................................................................................... 16

    C.     The Relevant *Prudential* and *Baby Products* Factors Also Support Settlement ........ 19

V.     THE PROPOSED PLAN OF ALLOCATION TREATS CLASS MEMBERS FAIRLY .. 22

VI.    THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED .............................. 23

VII.   THE PROFESSIONAL OBJECTOR'S OBJECTIONS SHOULD BE OVERRULED ..... 24

    A.     The Objection is Facially Invalid .............................................................. 27

    B.     Bandas' Objections Are Without Merit .................................................... 29

VIII.  CONCLUSION ................................................................................................... 37

**Cases**

*Alves v. Main*,
  No. 01-789, 2012 WL 6043272 (D.N.J. Dec. 4, 2012) ............................................................ 8

*Amchem Prods, Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................................ 15

*Arnett v. Bank of Am., N.A.*,
  No. 3:11-cv-1372-SI, 2014 WL 4672458 (D. Ore. Sept. 18, 2014)........................................ 18

*ATLAS v. Accredited Home Lenders Holding Co.*,
  No. 07-CV-00488-H (CAB), 2009 WL 3698393 (S.D. Cal. Nov. 4, 2009) .............................. 8

*Austin v. Penn. Dep't of Corr.*,
  876 F. Supp. 1437 (E.D. Pa. 1995) ........................................................................................ 14

*Bell Atlantic Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993) ................................................................................................ 12, 27

*Bezdek v. Vibram USA, Inc.*,
  809 F.3d 78 (1st Cir. 2015) .................................................................................................... 30

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ................................................................................................................ 33

*Brown v. Hain Celestial Grp., Inc.*,
  No. 3:11-cv-03082-LB, 2016 WL 631880 (N.D. Cal. Feb. 17, 2016).................................... 26

*Bullock v. Administrator of Kircher's Estate*,
  84 F.R.D. 1 (D.N.J. 1979) ........................................................................................................ 9

*Camberis v. Ocwen Loan Servicing, LLC*,
  No. 14-cv-02970-EMC, 2015 WL 7995534 (N.D. Cal. Dec. 7, 2015) .................................. 17

*Careccio v. BMW of N. Am. LLC*,
  No. 08-2619, 2010 WL 1752347 (D.N.J. Apr. 29, 2010) ........................................................ 9

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981) .................................................................................................................... 6

*Casey v. Citibank, N.A.*,
  No. 1:13-CV-353, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014) ......................................... 31

*Chavez v. PVH Corp.*,
  No. 13-CV-01797-LHK, 2015 WL 9258144 (N.D. Cal. Dec. 18, 2015).................................. 20

*Choi v. Mario Badescu Skin Care, Inc.*,
  ___ Cal. Rptr. 3d ____, B257480, 2016 WL 3438077 (Cal. App. June 21, 2016).................. 27

*Cosgrove v. Citizens Auto Fin., Inc.*,
  No. 09-1095, 2011 WL 3740809 (E.D. Pa. Aug. 25, 2011).................................................... 20

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012).................................................................................................... 36

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010).................................................................................................... 6

*Esslinger v. HSBC Bank Nevada, N.A.*,
  No. 10-3213, 2012 WL 5866074 (E.D. Pa. Nov. 20, 2012).................................................... 11

*Fickinger v. C.I. Planning Corp.*,
   646 F. Supp. 622 (E.D. Pa. 1986) ................................................................. 16, 19

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
   604 F. Supp. (E.D. Pa. 1985) .............................................................................. 6

*Fleisher v. Fiber Composites, LLC*,
   No 12-1326, 2014 WL 866441 (E.D. Pa. Mar. 5, 2014) ..................................... 10

*Gates v. Rohm & Haas Co.*,
   248 F.R.D. 434 (E.D. Pa. 2008) .......................................................................... 7

*Girsh v. Jepson*,
   521 F.2d 153 (3d Cir. 1975) ...................................................................... passim

*Hall v. AT&T Mobility LLC*,
   No. 07-5325, 2010 WL 4053547 (D.N.J. Oct. 13, 2010) ................................. 8, 11

*Hawthorne v. Umpqua Bank*,
   No. 11-cv-06700-JST, 2014 WL 4602572 (N.D. Cal. Sept. 15, 2014) ................. 30

*Henderson v. Volvo Cars of N. Am.*,
   Civil Action No. 09–4146, 2013 WL 1192479 (D.N.J. Mar. 22, 2013) ................. 33

*In re Aetna Inc. Secs. Litig.*,
   No. Civ. A. MDL 1219, 2001 WL 20928 (E.D. Pa. Jan. 14, 2001) ....................... 18

*In re Agent Orange Prod. Liab. Litig.*,
   818 F.2d 216 (2d Cir. 1987) .............................................................................. 37

*In re Am. Bus. Fin. Servs. Noteholders Litig.*,
   No. 05-232, 2008 WL 4974782 (E.D. Pa. Nov. 21, 2008) ............................. 22, 27

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D 109 (D.N.J. 2001) ............................................................................ 14

*In re AT&T Corp. Sec. Litig.*,
   455 F.3d 160 (3d Cir. 2006) ............................................................................... 7

*In re Auto. Refinishing Paint Antitrust Litig.*,
   617 F. Supp. 2d 336 (E.D. Pa. 2007) ................................................................ 13

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) ............................................................. 7, 20, 21, 32

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   281 F.R.D. 531 (N.D. Cal. 2012) ................................................................. 24, 25

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ................................................................... 9, 12, 16

*In re Cendant Corp. Sec. Litig.*,
   109 F. Supp. 2d 235 (D.N.J. 2000) ................................................................... 34

*In re Checking Account Overdraft Litig.*,
   275 F.R.D. 654 (S.D. Fla. 2011) ........................................................... 25, 28, 30

*In re Corel Corp. Sec. Litig.*,
   293 F. Supp. 2d 484 (E.D. Pa. 2003) ................................................................ 34

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
   248 F.R.D. 483 (E.D. Mich. 2008) ...................................................................... 8

*In re Diet Drugs Prods. Liab. Litig.*,
226 F.R.D. 498 (E.D. Pa. 2005) ........................................................... 5

*In re Elec. Carbon Prods. Antitrust Litig.*,
447 F. Supp. 2d 389 (D.N.J. 2006) ...................................................... 12

*In re Flonase Antitrust Litig.*,
291 F.R.D. 93 (E.D. Pa. 2012) ............................................................ 28

*In re Gen. Instrument Secs. Litig.*,
209 F. 2d 423 (E.D. Pa. 2001)............................................................. 18

*In re General Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)........................................... 6, 7, 12, 16

*In re Gilat Satellite Networks, Ltd.*,
No. CV–02–1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ........ 35

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................... 35

*In re High Sulfur Content Gasoline Prods. Liab. Litig*,
517 F.3d 220 (5th Cir. 2008)............................................................... 37

*In re Ikon Office Solutions Inc., Secs. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000) .......................................................... 22

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*,
296 F.R.D. 351 (E.D. Pa. 2013) ..................................................... 27, 34

*In re Initial Pub. Offering Sec. Litig.*,
728 F. Supp. 2d 289 (S.D.N.Y. 2010) ................................................. 25

*In re LifeUSA Holding Inc.*,
242 F.3d 136 (3d Cir. 2001) ............................................................... 15

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 631 (E.D. Pa. 2003) .................................................. 12

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)................................................................ 36

*In re PaineWebber, Ltd. P'Ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997) ......................................................... 23

*In re Par Pharm. Sec. Litig.*,
No. 06-3226, 2013 WL 3930091 (D.N.J. July 29, 2013)...................... 16

*In re Pet Food Prods. Liab. Litig.*,
629 F.3d 333 (3d Cir. 2010)............................................................. 7, 19

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998) ........................................................ passim

*In re Ravisent Techs., Inc. Secs. Litig.*,
No. Civ. A. 00-CV-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005).... 18

*In re Rent-Way Sec. Litig.*,
305 F. Supp. 2d 491 (W.D. Pa. 2003) ................................................... 8

*In re Royal Dutch/Shell Transp. Secs. Litig.*,
No. 04-374 (JAP), 2008 WL 9447623 (D.N.J. Dec. 9, 2008).............. 25

*In re Schering-Plough/Merck Merger Litig.*,
  No. 09-cv-1099, 2010 WL 1257722 (D.N.J. Mar. 26, 2010).................... 13
*In re Uponor Inc. F1807 Plumbing Fittings*,
  No.11-2247, Dkt. No. 132 (D. Minn. Sept. 11, 2012) ............................ 26
*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004).................................................... 15, 16, 37
*Jackson v. Wells Fargo Bank, N.A.*,
  136 F. Supp. 3d 687 (W.D. Pa. 2015) ............................................ 32
*Lake Forest Partners, L.P. v. Sprint Commc'ns Co., L.P.*,
  No. 2:12–cv–00999–AJS, 2013 WL 3048919 (W.D. Pa. June 17, 2013)................................ 33
*Larsen v. Trader Joe's Co.*,
  No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014)................................. 26
*Lazy Oil Co. v. Wotco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997) ............................................ 18
*Lenahan v. Sears, Roebuck & Co.*,
  No. 02-0045, 2006 WL 2085282 (D.N.J. July 24, 2006)......................... 18
*Martin v. Cargill, Inc.*,
  295 F.R.D. 380 (D. Minn. 2013)................................................ 32
*McCoy v. Health Net, Inc.*,
  569 F. Supp. 2d 448 (D.N.J. 2008) ............................................. 11
*McDonough v. Toys R. Us, Inc.*,
  80 F. Supp. 3d 626 (E.D. Pa. 2015) ............................................ 20
*Mehling v. New York Life Ins. Co.*,
  248 F.R.D. 455 (E.D. Pa. 2008) ................................................ 35
*Nichols v. Kline Beecham Corp.*,
  No. Civ. A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005)....................... 18
*O'Keefe v. Mercedes-Benz USA, LLC*,
  214 F.R.D. 266 (E.D. Pa. 2003) ................................................ 25
*Pallister v. Blue Cross & Blue Shield of Montana, Inc.*,
  2012 MT 198, 366 Mont. 175, 285 P.3d 562 ................................... 30
*Perkins v. Linkedin Corp.*,
  No. 13-CV-04303-LHK, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016) .................... 28
*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  No. 08-cv-42 (JG)(VVP), 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013)............................ 18
*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014)................................................... 30
*Rossi v. Proctor & Gamble Co.*,
  No. 11–7238 (JLL), 2013 WL 5523098 (D.N.J. Oct. 3, 2013)..................... 25
*Saccoccio v. JP Morgan Chase Bank, N.A.*,
  No. 13–21107–CIV, 2014 WL 3738013 (S.D. Fla. July 28, 2014) ....................... 32
*Sherin v. Gould*,
  679 F. Supp. 473 (E.D. Pa. 1987) .............................................. 6

*Shop-Vac Mktg. & Sales Practices Litig.*,
No. 4:12-md-2380, 2016 WL 3035302 (M.D. Pa. May 26, 2016) ......................................... 30
*Smith v. Dominion Bridge Corp.*,
No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) ..................................................... 13
*Spicer v. Chicago Bd. Options Exch., Inc.*,
844 F. Supp. 1226 (N.D. Ill. 1993) ....................................................................................... 37
*Stoetzner v. U.S. Steel Corp.*,
897 F.2d 115 (3d Cir. 1990) .................................................................................................. 12
*Sullivan v. DB Invs.*,
667 F.3d 273 (3d Cir. 2011) .............................................................................................. 7, 22
*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
309 F.3d 978 (7th Cir. 2002) ................................................................................................ 31
*Valley Drug Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) ............................................................................................ 36
*Varacallo v. Mass. Mut. Life Ins. Co.*,
226 F.R.D. 207 (D.N.J. 2005) ........................................................................................... 5, 25
*Walsh v. Great Atl. & Pac. Tea Co.*,
96 F.R.D. 632 (D.N.J. 1983) ............................................................................................. 6, 22
*Ward v. Dixie Nat'l Life Ins. Co.*,
595 F.3d 164 (4th Cir. 2010) ................................................................................................ 36
*Wilkins v. HSBC Bank Nev., N.A.*,
No. 14 C 190, 2015 WL 890556 (N.D. Ill. Feb. 27, 2015) .................................................... 26
*Williams v. First Nat'l Bank*,
216 U.S. 582 (1910) ................................................................................................................ 6
*Zakskorn v. Am. Honda Motor Co.*,
No. 2:11-CV-02610-KJM, 2015 WL 3622990 (E.D. Cal. June 9, 2015) ................................ 28

**Other Authorities**

Marie Leary, *Study of Class Action Objector Appeals in the Second, Seventh, and Ninth Circuit
Courts of Appeals*, Federal Judicial Center (October 2013) ..................................................... 24
*The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) ............................................... 24

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................. passim

**Treatises**

1 Joseph M. McLaughlin, *McLaughlin on Class Actions: Law & Practice* (8th ed. 2011) ......... 35

# I.     INTRODUCTION

Plaintiff Sherry Bodnar, on behalf of herself and the Settlement Class conditionally certified by the Court, *see* Dkt. 75 ¶ 19,[1] respectfully submits this Memorandum in Support of Plaintiff's Unopposed Motion for Certification of a Settlement Class and Final Approval of Class Action Settlement. For the reasons set forth below, the proposed settlement agreement ("Settlement" or "Settlement Agreement," *see* Dkt. 73-2) is fair, reasonable and adequate, and is the product of vigorous, arm's length negotiations overseen by both a well-respected private mediator and Magistrate Judge Wells. The Court should grant final approval because the Settlement provides $27,500,000 in monetary relief to the Class—*none of which* will revert under any circumstance to Bank of America—as well as meaningful prospective relief for *all* current Bank of America accountholders. And Class Members will receive these benefits without having to take any action; indeed, account credits or paper checks will be delivered to Settlement Class Members automatically once this Settlement becomes final. The Settlement is an excellent result for the class of Bank of America checking account holders defined in the Settlement Agreement (the "Settlement Class") and easily satisfies all Third Circuit criteria for final settlement approval.

Lastly, nearly 3 million Settlement Class Members (or approximately 96.5% of the class) were directly notified of the Settlement. In a testament to how well the Settlement was received by the Settlement Class, only one Settlement Class Member objected. And that lone objection was not raised by a concerned class member. Instead, the sole objection was made by a

---

[1] All Bank of America consumer checking Account holders in the United States who, from May 25, 2011, through the date of preliminary settlement approval, were charged Overdraft Fees on transactions that were authorized and approved when sufficient funds were available to cover the amount of authorization.

professional objector (who has filed objections to at least eight other settlements) and her notorious counsel, Christopher Bandas (who has been repeatedly condemned by Courts for making improper objections to hundreds of class settlements in order to cause delay and extort money). This professional objection is both procedurally improper and devoid of merit. It has been interposed solely for improper purposes and should be soundly rejected by the Court.

Plaintiff's Motion should be granted in its entirety.

## II.     BACKGROUND

In order to avoid burdening the Court, Plaintiff will not repeat the extensive summary of the history of the litigation she provided in her Motion for Preliminary Approval. Dkt. No. 73. Rather, Plaintiff will summarize developments since the filing of that Motion.

On February 5, 2016, the Court entered the Order Granting Preliminary Approval, Dkt. 75, which preliminarily approved the Settlement, found that the Settlement Class met the requirements of Fed. R. Civ. P. 23, and directed that notice be provided to the Class. *Id.* After preliminary approval, and in conjunction with the Settlement Administrator, the Parties finalized Class Notice materials. These notice materials summarized the Action,[2] the material terms of the Settlement, instructions for how to opt-out of or object to the Settlement the process, and the date, time, and place of the Final Approval Hearing. Declaration of Ricky Borges Regarding Notice and Settlement Administration, ("Borges Decl." attached hereto as Exhibit 2); *see also* Section III, *infra*. Class Counsel then worked closely with the Settlement Administrator to ensure that the class notice campaign was timely undertaken, and monitored the effort to ensure notice was delivered appropriately. Declaration of Hassan Zavareei ("Zavareei Decl.," attached hereto as Exhibit 1), ¶ 48. As discussed further below, Class Counsel also responded to questions from

---

[2] All capitalized terms have the meaning set forth in the Settlement Agreement, Dkt. No. 73-2.

Class Members after notice was disseminated. *Id.* ¶ 49. Class Counsel also researched and drafted this motion, including responding to the objections lodged by Dawn Weaver (and her professional objector attorney, Mr. Bandas).

## III. DISSEMINATION OF NOTICE HAS BEEN SUCCESSFUL

Robust notice has been successfully delivered to the Class. Indeed, the Settlement Administrator estimates that approximately 96.5% of the Class received direct notice. Borges Decl., ¶ 10. To implement the Notice program, the Parties chose Epiq Systems ("Epiq" or the "Settlement Administrator"), a firm highly experienced in national class action settlement notice and administration. *Id.*, ¶¶ 2-4. Together with Epiq, the Parties designed a Notice program that apprised the Class of (a) the pendency of the Action; (b) the Court's preliminary certification of the Class; (c) the terms of the Settlement and the Settlement Class Members' rights to opt-out of the Settlement Class or to object to the Settlement; (d) Class Counsel's expected fee application; and (e) the expected request for a Service Award for Plaintiff. *Id.* ¶ 4 & Exhibits A-C; Settlement Agreement, Section VII. It is anticipated that the total cost of notice and administration to date is $650,515.43. Borges Decl., ¶ 15. The Notice program was comprised of the following elements:

**Email Notice**: The Settlement Administrator sent 2,120,574 Email Notices to Settlement Class Members at the email addresses identified in Bank of America's records and provided to Bank of America by the Settlement Class Members. *Id.* ¶ 7. For email addresses in Bank of America's records that the Settlement Administrator learned were invalid (through an email bounceback or otherwise), the Settlement Administrator then mailed a Mailed Notice to that Settlement Class Member, as discussed below. Settlement Agreement, ¶ 67; Borges Decl., ¶ 7. Each Email Notice informed Class Members of their options for objecting, opting out, and remaining in the Settlement, and contained a link directly to both the Settlement Website and the

detailed (or "Long-Form") Notice, should class members want more information or to learn how to exclude themselves from or object to the settlement. *See* Dkt. 73-5. It also included the toll-free number for Class Members who had questions. *Id.*

**Mailed Notice**: Epiq additionally sent Mailed Notice via First Class Mail to 1,253,290 Settlement Class Members for whom Email Notice was not sent. Borges Decl., ¶ 6. The people to whom Mailed Notice was sent included former Bank of America accountholders and current accountholders whose email addresses were not available to the bank. *Id.* Further, for each Settlement Class Member whose attempted Email Notice was returned or bounced back as undeliverable, the Settlement Administrator mailed a Mailed Notice to each Class Member at the address identified in Defendants' records. Borges Decl., ¶ 7. The Settlement Administrator mailed 1,417,053 Mailed Notices. *Id.*, ¶¶ 6-7. Like the Email Notice, the Mailed Notice informed Settlement Class Members of their options for objecting, opting out, and remaining in the Settlement, and directed Settlement Class Members to the Settlement Website, should class members want more information or to learn how to exclude themselves from or object to the settlement. *See* Dkt. 73-3. The Mailed Notice also contained the toll-free number for Class Members who had questions. *Id.* Approximately 144,005 Mailed Notices were initially returned as undeliverable. Borges Decl., ¶ 8. The Settlement Administrator performed reasonable address traces for all postcards that were returned as undeliverable. *Id.* As of June 24, 2016, the Settlement Administrator completed the re-mailing of Mailed Notice postcards to those Class Members whose original mailed postcards were returned as undeliverable and whose new addresses were identified as of that time through address traces. *Id.* After the address tracing and subsequent remailing, only 108,058 Email or Mailed Notices remain undelivered. *Id.*, ¶ 10.

**The Settlement Website, the Detailed Notice, and the Toll-Free Number**: Epiq established a Settlement Website (www.BankofAmericaOverdraftSettlement.com), which explained the Settlement, gave answers to frequently asked questions, allowed for the electronic submission of Claims, described the Settlement payment distribution process, and provided links to the Detailed Notice, the Agreement, and other court documents, including the Complaint and Amended Complaint filed in the Litigation. Borges Decl., ¶ 13. There have been approximately 97,118 page views of the Settlement Website as of June 24, 2016. *Id.* Epiq also established an automated toll-free telephone line for Settlement Class Members to call with Settlement-related inquiries, and live telephone support to answer the questions of Settlement Class Members who called with such inquiries. *Id.* As of June 24, 2016, Epiq has received 30,844 calls to the toll-free number. *Id.* In addition, Class Counsel communicated directly with dozens of Settlement Class Members in response to questions about the Settlement. Zavareei Decl., ¶ 49.

In Plaintiff's preliminary approval briefing, which discussed the proposed means for notice, Plaintiff provided case law and a discussion of how the notice program comports with due process, and Plaintiff incorporates that discussion by reference herein. Dkt. 73 at Section V. Nothing has changed with respect to the due process considerations, other than the fact that the notice program proposed in the preliminary approval briefing has now been carried out and, as discussed above, has been successful. Indeed, notice reached approximately 96.5% of class members by either email or mail (Borges Decl., ¶ 10), a rate found by courts to satisfy due process requirements. *E.g.*, *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 226 (D.N.J. 2005) (finding notice program satisfied due process where publication notice reached 92.48% of class); *In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498 (E.D. Pa. 2005) (same for "over 95 percent" of class receiving notice).

## IV. THE COURT SHOULD FINALLY APPROVE THE SETTLEMENT

Federal Rule of Civil Procedure 23(e) provides that a class action shall not be dismissed or compromised without the approval of the court. *See also In re General Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, at 785 (3d Cir. 1995) ("GMC Trucks"). While this Court has discretion in determining whether to approve the Settlement, it should be hesitant to substitute its judgment for that of the parties who negotiated the Settlement. *See Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985). "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. . . . They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *Walsh v. Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642-43 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1983). It is also well settled that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998); *Sherin v. Gould*, 679 F. Supp. 473, 474 (E.D. Pa. 1987). Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. The Third Circuit has reiterated the long standing principle that there is a "strong presumption in favor of voluntary settlement agreements." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010). "This presumption is especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'" *Id*. at 595 (citation omitted).

In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the Third Circuit advised district courts to consider the following factors in deciding whether to approve a proposed settlement of a class action under Rule 23(e):

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

*Id.* at 157 (citation omitted). *Accord In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). *See also In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164-65 (3d Cir. 2006); *GMC Trucks*, 55 F.3d at 782. In more recent decisions in *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d at 317, and *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013), the Third Circuit has set forth additional factors that are sometimes relevant when evaluating whether to approve settlements. *See* Section IV.C, *infra*.

## A. The Proposed Settlement is Presumptively Fair Because It Is a Result of Vigorous, Informed, Arm's Length Negotiations.

Before the Court addresses the *Girsh* factors, it is important to note that a presumption of fairness applies when reviewing a proposed settlement where, as here, the settlement is reached by experienced counsel after arm's-length negotiations. *See, e.g.*, *GMC Trucks*, 55 F.3d at 785; *Sullivan v. DB Invs.*, 667 F.3d 273, 320 (3d Cir. 2011); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 439, 444 (E.D. Pa. 2008) (stressing the importance of arm's length negotiations and highlighting the fact that the negotiations included "two full days of mediation"). Such is the case here.

This case has been hard fought, and the settlement negotiations were extensive and adversarial in nature—all taking place during an equally extensive and hard-fought discovery

process. The hotly contested negotiations spanned nearly a full year. The negotiations included mediation settlement sessions assisted by both Magistrate Judge Wells and a renowned mediation expert, the Honorable Layn Phillips (Ret.).[3] *See Hall v. AT&T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *7 (D.N.J. Oct. 13, 2010) ("the participation of an independent mediator in settlement negotiations virtually insures [sic] that the negotiations were conducted at arm's length and without collusion between the parties.") (citation omitted). The Parties' extensive arm's length negotiations fully support a finding that the proposed settlement is fair.

Moreover, the Parties have vigorously litigated this case and have thoroughly explored the issues in this Litigation. Zavareei Decl., ¶¶ 27-42. As discussed above, Class Counsel conducted a thorough investigation and analysis of Plaintiff's claims and engaged in extensive formal discovery with Bank of America. *Id.*, ¶ 31. Class Counsel's review of that extensive discovery enabled them to gain an understanding of the evidence related to central questions in the case, and prepared them for well-informed settlement negotiations. *Id.*, ¶ 35. Finally, Class Counsel and Defendant's counsel are experienced in class action litigation. *Id.*, ¶¶ 2-26, 51.

Class Counsel's "assessment of the [S]ettlement as fair and reasonable is entitled to considerable weight." *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 509 (W.D. Pa. 2003) (internal citation omitted); *Alves v. Main*, No. 01-789, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012), *aff'd*, 559 Fed. App'x 151 (3d Cir. 2014) ("courts in this Circuit traditionally attribute

---

[3] *See In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 498, n.14 (E.D. Mich. 2008) (recognizing "the outstanding work done by Judge Phillips" in settlement negotiations and "the added benefit of the insight and considerable talents of [this] former federal judge who is one of the most prominent and highly skilled mediators of complex actions"); *ATLAS v. Accredited Home Lenders Holding Co*., No. 07-CV-00488-H (CAB), 2009 WL 3698393, at *3 (S.D. Cal. Nov. 4, 2009) ("The settlement negotiations were also fair. They were closely supervised by the Honorable Layn Phillips (Ret.) and conducted at arm's length by experienced and competent counsel.").

significant weight to the belief of experienced counsel that settlement is in the best interest of the class") (internal quotations omitted). Class Counsel, which has extensive experience prosecuting class actions, believes that the Settlement is a highly favorable result and in the best interest of the Settlement Class. Zavareei Decl., ¶ 46. In reaching this conclusion, Class Counsel considered the strengths and weaknesses of Plaintiff's class claims based on the evidence adduced to date as well as Defendants' interpretation of that evidence and the risks that the Court or a jury may have ruled in favor of Defendants on some or all of the claims resulting in no or little recovery for the Settlement Class. *Id.*

**B. Examination of the *Girsh* Factors Supports Approval of the Settlement**

1. The Complexity, Expense, and Likely Duration of the Litigation Weigh in Favor of Final Approval

The first *Girsh* factor—the complexity, expense, and likely duration of the litigation— assesses the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001). Under this analysis, courts consider the vagaries of litigation and "compare the significance of immediate recovery by way of compromise," *Bullock v. Administrator of Kircher's Estate*, 84 F.R.D. 1, 10-11 (D.N.J. 1979), to "the mere possibility of relief in the future, after protracted and expensive litigation." *Careccio v. BMW of N. Am. LLC*, No. 08-2619, 2010 WL 1752347 (D.N.J. Apr. 29, 2010). "It has been held proper 'to take the bird in hand instead of a prospective flock in the bush.'" *Bullock*, 84 F.R.D. at 11 (citation omitted).

This is a highly complex case—both factually and legally. If not for this Settlement, the case would have continued to be fiercely contested by all parties. While Class Counsel has already expended substantial amounts of time and money to reach the point of settlement, further significant time and expenses would be incurred to complete pre-trial proceedings and conduct a

trial. The complexity of this case is inherent to Plaintiff's claims, which involve an analysis of the Bank's practices and policies in the context of its consumer-facing account documents. Indeed, even the factual predicates of this case were difficult to decipher and understand. Specifically, the Bank's actual practices and how it handles and process the recurring debit card transactions at issue here were only uncovered after extensive discovery. In addition, an even more complicated analysis regarding how each of over 3 million Settlement Class Members were affected by those practices was and would continue to be necessary to maintain class litigation— an analysis that would be the subject of a costly battle of the experts.

In order to prevail in a contested case, Plaintiff would have had to defeat the Bank's second motion to dismiss, win at the class certification stage, defeat summary judgment, and prevail at trial; not to mention litigate any number of intermediate disputes over discovery matters, and the like. Further, appeals of both the class certification ruling and trial likely would have followed. In short, without a settlement, Plaintiff would have had to fight for years at the trial and appellate level in order to secure classwide relief. *E.g.*, *Fleisher v. Fiber Composites, LLC*, No 12-1326, 2014 WL 866441, at *11 (E.D. Pa. Mar. 5, 2014) ("[I]n the absence of settlement, significant costs in terms of both time and money likely would result from the continued litigation of this case. In addition to discovery costs, continued litigation potentially would have entailed various dispositive motions and a substantial trial. Whatever the disposition of the case, litigation likely would have continued for some time thereafter through post-trial motions and appeal. The time and resources saved by the avoidance of these costs would benefit all parties."). The Court should approve the settlement because Plaintiff procured such relief much more quickly through a settlement. *See Prudential*, 148 F.3d at 317 (noting how "settlement provide[s] class members the opportunity to file claims immediately after court

approval of the settlement, rather than waiting through what no doubt would be protracted litigation.").

By way of another example, although Plaintiff retained an expert who performed some work in furtherance of the settlement, because expert reports had not yet been exchanged and expert depositions had not taken place, significant additional expert testimony likely would have been required in the lead-up to, and during, trial. This fact alone weighs in favor of settlement approval. *See Hall,* 2010 WL 4053547 at *7 (fact that trial would have required substantial expert testimony weighed in favor of approving settlement); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 460 (D.N.J. 2008) (same). Further, the number of accountholders and overdraft fees at issues would have made the litigation very expensive. In another case in this District involving allegations of improper fee-charging practices, the court stressed that the case was hugely complex by the mere dint of the millions of accountholders in discussing the complexity of the case. *Esslinger v. HSBC Bank Nevada, N.A.*, No. 10-3213, 2012 WL 5866074, at *6 (E.D. Pa. Nov. 20, 2012).

2. The Reaction of the Class to the Settlement

The second *Girsh* factor—the reaction of the Settlement Class to the Settlement—also strongly favors final approval. Out of 3,061,530 Settlement Class Members who were sent a notice, only 49, or 0.0016%, timely opted out of the settlement,[4] and only one (an infinitesimal percentage of the Class) filed an objection. Borges Decl., ¶¶ 5, 11-12. And that sole objection is not a legitimate objection driven by a class member that is truly unhappy with the settlement. It is a professional objection by a professional objector supported by an attorney who will not even

---

[4] Epiq received an additional four late opt-outs. Borges Decl., ¶ 12.

subject himself to the Court's sanctioning powers.[5] In effect, there are really no objections at all, which is remarkable in light of the size of the class.

Given the overall effectiveness of the notice program, which reached approximately 96.5% of the class, Borges Decl., ¶ 10, the fact that so few Class Members opted out or objected is a strong indicator that the Settlement is fair, reasonable, and adequate. *See, e.g.*, *Cendant*, 264 F.3d at 234-35 (affirming trial court decision that class reaction was "extremely favorable," where 478,000 notices were sent, four objections were made, and 234 class members opted out); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (ruling that "only" 29 objections, among 281 class members, "strongly favors settlement"); *Bell Atlantic Corp. v. Bolger*, 2. F.3d 1304, 1313-14 (3d Cir. 1993) ("Less than 30 of approximately 1.1 million shareholders objected . . . . This small proportion of objectors does not favor detailing settlement.").

3. The Stage of the Proceedings Weighs in Favor of Final Approval

The stage at which settlement occurs demonstrates "whether counsel had an adequate appreciation of the merits of the case before negotiating." *GMC Trucks*, 55 F.3d at 813. "Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006) (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)). There is no doubt that, here, "meaningful discovery" took place.

Plaintiff requested, received and reviewed over 50,000 pages of documents. Zavareei Decl., ¶ 31. That document production was in response to three separate sets of document

---

[5] Tellingly, Mr. Bandas has not made an appearance before this Court, and states that he will not do so. This is almost certainly to avoid the fate that has befallen him in other courts: the levelling of sanctions for his harassing, unprofessional, and vexatious behavior.

requests—and a contentious meet and confer process regarding those document requests. *Id.* Plaintiff deposed five separate Bank of America employees, in San Francisco, CA, Worcester, MA, and Charlotte, NC. Two of the depositions were Rule 30(b)(6) depositions. In addition, Plaintiff issued four third party subpoenas, and worked with the recipients of those subpoenas to attain relevant documents. *Id.*, ¶ 32. Moreover, with the help of a well-qualified expert, Plaintiff spent a large amount of time and effort decoding, deciphering, and analyzing a massive trove of Bank of America account data in order to analyze potential damages and ascertain class membership. Id., ¶ 34. In addition, Defendant deposed Plaintiff Bodnar in Allentown, PA. *Id.*, ¶ 43.

Simply put, there was no shortage of information and no rush to settlement here. This Settlement was reached only after both sides endured the rigors of hard-fought discovery and litigation.

### 4. The Risks of Establishing Liability and Damages Weigh in Favor of Final Approval

In assessing the fairness of the Settlement, the Court must balance the benefits afforded the class, including the immediacy of a substantial recovery, against the risks of establishing liability and damages through continued litigation (the fourth and fifth *Girsh* factors). *See Prudential*, 148 F.3d at 319; *Smith v. Dominion Bridge Corp*., No. 96-7580, 2007 WL 1101272, at *5 (E.D. Pa. Apr. 11, 2007). In considering this factor, courts have recognized that "[a] trial on the merits always entails considerable risks," *In re Schering-Plough/Merck Merger Litig.*, No. 09-cv-1099, 2010 WL 1257722, at *10 (D.N.J. Mar. 26, 2010), and "no matter how confident one may be of the outcome of the litigation, such confidence is often misplaced." *In re Auto. Refinishing Paint Antitrust Litig*., 617 F. Supp. 2d 336, 343 (E.D. Pa. 2007) (citation omitted).

The factual predicates of this case are extremely complicated. While Class Counsel believes that Plaintiff's claims are meritorious, there are substantial risks to achieving a better result for the Settlement Class through continued litigation. Those risks are laid bare in the two motions to dismiss that Bank of America filed—only one of which had been denied at the time of the Settlement. Dkt. Nos. 18, 53 and 30. Specifically, Plaintiff faced legal risk that, *inter alia*; a factfinder could determine the Bank's disclosures were adequate, not misleading and could not form the basis of a breach of contract and covenant of good faith and fair dealing claims; that the existence of a contract barred Plaintiff's conversion and unjust enrichment claims; and that Plaintiff's Pennsylvania consumer protection and common law claims were likewise due to the economic loss doctrine and absence of justifiable reliance. Zavareei Decl., ¶ 54.

Needless to say, protracted litigation carries inherent risks that would necessarily have delayed and endangered Settlement Class Members' monetary recovery. *Id.*, ¶ 56. This Settlement, on the other hand, provides substantial relief to Settlement Class Members without further delay. Courts favor settlements in class action cases because such cases consume an extraordinary amount of private (and judicial) resources. *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D 109, 119 (D.N.J. 2001) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (quotations omitted); *Austin v. Penn. Dep't of Corr.*, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995). The present case is no exception.

5. The Risks of Maintaining the Class Action and Class Certification Through Trial Weigh in Favor of Approval

In addition to the risks of establishing liability and damages, Plaintiff also faced risks on class certification. Although the Court conditionally certified nationwide a class for settlement purposes, differences in state law that often complicate the certification of a nationwide litigation

class, *see, e.g., In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 n.11 (3d Cir. 2001), are "irrelevant to certification of a settlement class." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004); *see also Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need no inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."). Thus, there is no guarantee that a nationwide class would have been certified for litigation purposes in this case. But for the Settlement, Defendant would have contested certification of the class. In attempting to block class certification, Bank of America would point to variations in accountholders' response to, and interpretation of, Bank disclosures, a factor that could conceivably present individualized questions with respect to reliance under Pensylvania's Unfair Trade Practices and Consumer Protection Law, and/or implicate Plaintiff's good faith and fair dealing claim. Further, the Bank likely would have argued that differences in the account agreements issued to different class members at different times presented individualized issues unfit for certification. And the Bank undoubtedly would have contended that differences in state law would have precluded certification of Plaintiff's common law claims on a classwide basis. If class certification was denied and that denial was affirmed on appeal, the value of Plaintiff's claims would have been virtually extinguished. Zavareei Decl., ¶ 55.

Further, even if Plaintiff successfully certified a class, and the certification survived a lengthy appeal, Federal Rule of Civil Procedure 23(c)(1) provides that a class certification order may be altered or amended any time before a decision on the merits. *See, e.g.*, *Prudential*, 148 F.3d at 321 ("Under Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable."). Thus, in any class action suit, even if a class is

initially certified, there is always a risk that it will be modified or decertified prior to a decision on the merits.

6. The Ability of Defendants to Withstand a Greater Judgment

This factor evaluates whether a defendant "could withstand a judgment for an amount significantly greater than the Settlement." *Cendant*, 264 F.3d at 240. While Bank of America here could have withstood a judgment in excess of the Settlement Amount, the fact that it could have paid more money does not render the Settlement unreasonable. *See In re Warfarin*, 391 F.3d at 538 ("[T]he fact that [the defendant] could afford to pay more does not mean that it is obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached"). Thus, this factor is neutral.

7. The Settlement is Reasonable in Light of All of the Attendant Risks of Litigation

The final two *Girsh* factors are typically considered in tandem, and ask "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. "[I]n any case, there is a range of reasonableness with respect to a settlement." *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 630 (E.D. Pa. 1986). "In making this assessment, the Court compares the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement." *In re Par Pharm. Sec. Litig*., No. 06-3226, 2013 WL 3930091, at *7 (D.N.J. July 29, 2013) (citing *GMC Trucks*, 55 F.3d at 806). As explained herein, in the Settlement Agreement, and in the Zavareei Declaration, the Settlement provides for a substantial and certain cash payment of $27,500,000 for the direct benefit of the Settlement Class, in addition to valuable prospective relief. Indeed, the prospective relief is extremely valuable: Bank of America will send a new, separate disclosure—drafted in

conjunction with Class Counsel—to clarify its "debit hold" and debit card processing practices. Settlement Agreement, ¶ 52. This will give accountholders the ability to judge for themselves whether or not they want to continue to do business with BofA—and validates Plaintiff's position that BofA's obscure, unexpected processing practices are, at the very least, something that consumers should be made aware of. If the value of this new disclosure could be quantified, it would likely exceed even the value of the Settlement Fund.

But even if this Court were to evaluate the $27.5 million recovery on its own, the Settlement benefits are robust. Based on extensive expert analysis, Plaintiff estimates this amount represents between 13-48% of the *maximum* amount damages they may have been able to secure at trial, depending on the damages methodology endorsed by the factfinder. Zavareei Decl., ¶ 45. A 13% recovery would represent, essentially, all overdraft fees charged on debit card transactions when a transaction was authorized into a positive available balance. But it is entirely possible that the Court would have held that this damages number was unsupportable. For example, the Court may have held that the contracts at issue here <u>did</u> allow Bank of America to charge overdraft fees on many of those transactions. In that event, the class's damages would have been calculated, alternatively, based on the second main damages theory alleged in Plaintiff's Amended Complaint—*viz.*, that the Bank was not allowed to charge overdraft fees on debit card transactions whose corresponding "debit holds" or "memo holds" caused other, later in time checking account transactions to incur overdraft fees. In that scenario, the $27.5 million recovery would amount to nearly half of the potential damages to the class. *Id.* Lastly, and crucially, no monies whatsoever will be returned to Bank of America, a feature many courts praise in the context of approving settlements. *E.g.*, *Camberis v. Ocwen Loan Servicing, LLC*, No. 14-cv-02970-EMC, 2015 WL 7995534, at *3 (N.D. Cal. Dec. 7, 2015) (granting final

approval where, among other reasons, "[t]here is no arrangement for funds to revert back to [d]efendant"); *Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372-SI, 2014 WL 4672458, at *10 (D. Ore. Sept. 18, 2014) (finding absence of evidence of collusion or conflicts of interest where "the Settlement Fund is non-reversionary"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-cv-42 (JG)(VVP), 2013 WL 4525323, at *13 (E.D.N.Y. Aug. 27, 2013) (approving plan of allocation where "no funds will revert to settling defendants regardless of the number of opt-outs and regardless of the number of class members who submit valid claims").

This recovery of between 13% and 48%—which, again, excludes consideration of the valuable prospective relief provided by the Settlement—is well within the range of recovery routinely approved by courts in this Circuit. *E.g.*, *Lenahan v. Sears, Roebuck & Co.*, No. 02-0045, 2006 WL 2085282 at *15-16 (D.N.J. July 24, 2006) (deeming settlement fund of $15 million "within the range of reasonableness" where early damages estimates totaled $104 million); *Nichols v. SmithKline Beecham Corp.*, No. Civ. A. 00-6222, 2005 WL 950616 at *16 (E.D. Pa. Apr. 22, 2005) (approving settlement fund representing between 9.3% and 13.9% of damages estimates as "consistent with those approved in other complex class action cases"); *In re Ravisent Techs., Inc. Secs. Litig.*, No. Civ. A. 00-CV-1014, 2005 WL 906361, at * 9 (E.D. Pa. Apr. 18, 2005) (finding settlement of 12.2% to be "within the range of reasonable recovery for a securities class action"); *In re Gen. Instrument Secs. Litig.*, 209 F. 2d 423, 431 (E.D. Pa. 2001) (finding 11% recovery of plaintiffs' high-end damages estimate to be "within the range of reasonableness"); *In re Aetna Inc. Secs. Litig.*, No. Civ. A. MDL 1219, 2001 WL 20928 at *12 (E.D. Pa. Jan. 14, 2001) (accepting recovery of approximately 10% of best possible recovery); *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 319, 339 (W.D. Pa. 1997) (approving settlement that "represents only about 5.35% of the estimated damages for the entire class

period"); *In re Greenwich Pharm. Sec. Litig.*, No. 92-3701, 1995 WL 251293, at *5 (W.D. Pa. Apr. 26, 1995) (approving $4.375 million settlement that obtained 4.4% of estimated maximum damages).

However measured, the $27.5 million monetary benefit and prospective relief conferred upon the Settlement Class represents a significant recovery, under all of the circumstances and in light of the substantial risks of litigation on both the merits and in connection with what surely would have been a contested class certification proceeding. Zavareei Decl., ¶ 55.

## C. The Relevant *Prudential* and *Baby Products* Factors Also Support Settlement

The Third Circuit has articulated other factors that can be relevant to the evaluation of some, but not all, class settlements. In *Prudential*, the Third Circuit identified several additional factors that "are illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." *In re Pet Food*, 629 F.3d at 350. Those factors are the following:

> [1] [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; [2] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [3] whether class or subclass members are accorded the right to opt out of the settlement; [4] whether any provisions for attorneys' fees are reasonable; and [5] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. Although not all of the *Prudential* factors are relevant to approval of the proposed Settlement, those that are weigh in favor of final approval. First, the underlying substantive issues in this case are mature. As discussed above, there has been significant discovery on the merits, *see, e.g.*, Section IV.B.3, *supra*, and Class Counsel is aware of the complexity and risks inherent in a trial on the merits, *see, e.g.*, Sections IV.B.1, 4, and 5, *supra*,

Second, all individual Settlement Class Members are being treated equally and fairly, as the settlement fund is being allocated such that each class member receives a *pro rata* share of the settlement fund based on the number of relevant overdraft fees experienced, with each class member to receive no less than $5. Third, as discussed in Sections III and IV.B.2, *supra*, Settlement Class Members were provided with robust notice and were provided with the opportunity to opt-out, which only 49 out of 3,061,530 Class Members did. Borges Decl., ¶¶ 5, 11-12. Fourth, the fees requested are reasonable, as more fully discussed in Plaintiff's concurrently filed Motion for Attorneys Fee and Expense Award, and Service Award.[6] Finally, there is no claims process here. Instead Settlement Class Members receive payment without the need for any effort. This weighs in favor of certification. *E.g.*, *Cosgrove v. Citizens Auto Fin., Inc.*, No. 09-1095, 2011 WL 3740809, at *8 (E.D. Pa. Aug. 25, 2011) (finding *Prudential* satisfied where "[c]lass members are not required to submit claim forms, and will simply receive checks for their pro rata share"); *Chavez v. PVH Corp.*, No. 13-CV-01797-LHK, 2015 WL 9258144, at *2, 5 (N.D. Cal. Dec. 18, 2015) (deeming settlement fair, adequate and reasonable and overruling objections because, among other reasons, class members do not need to submit claim form in order to be paid).

Finally, the Third Circuit added an additional factor in *In re Baby Prods. Antitrust Litig.*, in which it examined the degree to which a proposed settlement provided a "direct benefit" to the class. 708 F.3d at 174; *see also McDonough v. Toys R. Us, Inc.*, 80 F. Supp. 3d 626, 650-51 (E.D. Pa. 2015) (discussing "*Baby Products* factor"). The court set forth the "direct benefit"

---

[6] Because Class Counsel is not aware of other individuals, classes, or subclasses asserting similar claims against Bank of America, Plaintiff submits that the *Prudential* factors calling for comparison to other such claimants is not relevant to the analysis of the proposed Settlement in this matter.

analysis as follows:

> [A] district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards. Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds.

708 F.3d at 174. Here, because Class Members automatically receive settlement proceeds unless they requested exclusion from the settlement, *all* Class Members that do not request exclusion receive a direct benefit from the Settlement. Moreover, as discussed above, the settlement recovery of between 13% and 48% compared to Settlement Class Members' estimated damages in this case is a reasonable result. *See* Section IV.B.7, *supra*.

With respect to *cy pres*, there is no pre-set amount for distribution. Indeed, there will be no *cy pres* component unless Settlement Class Members fail to cash their settlement disbursement checks. If that eventuality occurs, Class Counsel and Defendant will confer to determine whether it is economically feasible to make a so-called "secondary distribution" of the remaining funds to Class Members who already received a disbursement. Settlement Agreement, ¶ 83b. It is Class Counsel's experience that a secondary distribution is feasible with as little as $200,000 in residual funds. Zavareei Decl., ¶ 57. Therefore, any remaining funds to be distributed to a *cy pres* recipient will represent a small percentage of the total settlement funds. Only after any secondary distribution would there even be the possibility of a *cy pres* distribution—and it would likely be an exceedingly small one. In short, virtually all of the Settlement monies will be disbursed to Class Members. And before even one penny is disbursed via *cy pres*, the Court would need to approve the *cy pres* recipient. Settlement Agreement, ¶ 83c.

For all the foregoing reasons, the proposed Settlement satisfies the factors articulated by the Third Circuit and should be approved as fair, reasonable, and adequate.

## V. THE PROPOSED PLAN OF ALLOCATION TREATS CLASS MEMBERS FAIRLY

The proposed Settlement treats all Settlement Class Members fairly and does not provide undue preferential treatment to any individual Settlement Class Member. A trial court has broad discretion in approving a plan of allocation. *See Sullivan*, 667 F.3d at 328. The test is simply whether the proposed plan of allocation, like the settlement itself, is fair and reasonable. *See Walsh*, 726 F.2d at 964 ("The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable."); *see also In re Am. Bus. Fin. Servs. Noteholders Litig.*, No. 05-232, 2008 WL 4974782, *9 (E.D. Pa. Nov. 21, 2008) (holding that allocation plan is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate"). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *In re Ikon Office Solutions Inc., Secs. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000). The proposed plan of allocation easily meets this standard. Indeed, the Parties consulted in person with Magistrate Judge Wells to devise a plan for allocating the Settlement Fund that was just and equitable to all Settlement Class Members. Zavareei Decl., ¶¶ 39.

Specifically, the plan of allocation in the Settlement—which is discussed in more detail in the Settlement Agreement, *see* ¶¶ 73-83—divides the Net Settlement Fund (that is, the Settlement amount minus any deductions for notice and administration costs, class representative service award, and attorneys' fees and costs) on a *pro rata* basis based on the number of relevant Overdraft Fees assessed against an account during the Class Period. In short, the higher number of relevant Overdraft Fees a Settlement Class Member incurred, the higher his or her Settlement distribution will be. In addition, the Parties have agreed to a minimum distribution amount of $5 for a Settlement Class Members. This minimum amount serves to ensure that the benefit to the

Class Member far exceeds the cost of delivering the benefit to the Settlement Class Member (in the form of a paper check, for example).

In determining whether a proposed plan is fair, courts look to the opinion of counsel. *See In re PaineWebber, Ltd. P'Ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) ("[T]he adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."). The plan of allocation rests, entirely, upon accurate, extensive overdraft fee data maintained in Bank of America's records, and provided by the Bank to allow for the administration of this Settlement. Zavareei Decl., ¶ 41. In short, the plan ensure that those who were harmed most also receive the greatest distributions—and some Class Members will receive hundreds of dollars based on this formula. This plan of allocation is fair and reasonable, and merits final approval. *Id.*, ¶ 42.

## VI.   THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

In presenting the proposed Settlement to the Court for preliminary approval, Plaintiff requested that the Court preliminarily certify the Settlement Class so that notice of the proposed Settlement, the final approval hearing, and the rights of Settlement Class Members to request exclusion or object could be issued. In its Preliminary Approval Order, this Court preliminarily certified the Settlement Class. Nothing has changed to alter the propriety of the Court's certification, and, for all the reasons stated in Plaintiff's Memorandum in Support of Unopposed Motion for Certification of a Settlement Class and Preliminary Approval of Class Action Settlement (Dkt. 73) incorporated herein by reference, Plaintiff now requests that the Court grant final certification of the Settlement Class for purposes of carrying out the Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3), appoint Lead Plaintiff Sherry Bodnar as Class Representative

and appoint Tycko & Zavareei LLP, Kopelowicz Ostrow and Finkelman Shah as Class Counsel for the Settlement Class.

## VII.   THE PROFESSIONAL OBJECTOR'S OBJECTIONS SHOULD BE OVERRULED

The only objection is this case is from Dawn Weaver, who has herself served as an objector to at least *eight* other class action settlements, Dkt. No. 78 at 8, and is represented by the notorious professional objector Christopher Bandas.

Bansas, Weaver, and their local counsel, Lightman & Manochi ("L&M") are engaged in what commentators have characterized as "objector blackmail." Fitzpatrick, Brian T., *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1624-25, 1633-41 (2009). Numerous courts have specifically criticized Bandas's conduct in filing meritless objections to class settlements. For example:

> [A]ttorney Christopher Bandas, [is] a "professional" or "serial" objector . . . Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct.

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (footnote omitted). As he has done in no fewer than 54 (but likely considerably more)[7] cases,

---

[7] Partially because Bandas' *modus operandi* is to not file a notice of appearance, it is incredibly difficult to quantify the true number of objections that he has filed. With that said, the numbers are staggering and suggest that the number of objections Bandas has filed reach the hundreds. According to Federal Judicial Center ("FJC") study, which mentions Bandas by name over 100 times, Bandas had filed 24 *notices of appeal* of class settlements in *just three federal circuits* between 2008 and March of 2013. *See* Marie Leary, *Study of Class Action Objector Appeals in the Second, Seventh, and Ninth Circuit Courts of Appeals*, Federal Judicial Center (October 2013), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/class-action-objector-appeals-leary-fjc-2013.pdf/$file/class-action-objector-appeals-leary-fjc-2013.pdf (last visited June 27, 2016). Moreover, the website www.serialobjector.com lists at least 54 objections in which Bandas has been involved, and his activity has in no way slowed since the FJC's 2013 study. *See* http://www.serialobjector.com/persons/4 (last visited June 27, 2016). And that website lists only

Bandas is . . . improperly attempting to "hijack" the settlement of the Actions from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate, and unspecified "legal fees."

*Id.* at n.4 (citation omitted). The non-constructive conduct of "professional objectors" such as Bandas and his clients has been summarized as follows:

[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.

*Id.* at n.3 (citation omitted).[8] Concurrent with this filing, Plaintiff has filed a Request for Judicial Notice documenting the most egregious instances in which courts around the country have found that Bandas has objected to settlements in order to delay proceedings and extract a cash payment for himself.

Notably, only L&M, and not Bandas, has entered an appearance in this case and Bandas only mentions in passing that he represents Ms. Weaver. Dkt. No. 78 at 7. This is a tactic regularly employed by Bandas and other professional objectors in order avoid appearing before

---

one state court case. Plaintiff's concurrently filed Request for Judicial Notice provides five exemplars of state court cases in which Bandas' conduct has been criticized.

[8] *See also In re Royal Dutch/Shell Transp. Secs. Litig.*, No. 04-374 (JAP), 2008 WL 9447623, at *30 (D.N.J. Dec. 9, 2008). "[P]rofessional objectors . . . bring objections, typically of a generic sort, that are lodged primarily for the purposes of delay and to extract (indeed, often, to extort) payment to the objector's counsel to go away." *Rossi v. Proctor & Gamble Co.*, No. 11–7238 (JLL), 2013 WL 5523098, at *7 n.2 (D.N.J. Oct. 3, 2013) (quoting *In re Checking Account Overdraft Litig.*, No. 09–md02036–JLK, Dkt. No. 1885–7 (S.D. Fla. Sept. 16, 2011)) (alteration in original). "Federal courts are increasingly weary of professional objectors." *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003); *In re Royal Dutch/Shell*, 2008 WL 9447623, at *30 (quoting *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240 (D.N.J. 2005)); *see also, e.g., In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) ("I concur with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients.") (collecting cases).

the court so as to be subject to sanctions. Courts recognize this tactic as one that indicates a professional objector's untoward motivations. For example:

> [T]he Palmer Objectors have evidenced bad faith and vexatious conduct . . . . [T]he Palmer Objectors appear to be represented by an attorney who has not entered an appearance in this case and who is believed to be a serial objector to other class action settlements. This attorney, Darrell Palmer, paid the appellate filing fee on behalf of the Palmer Objectors, and the documents filed on their behalf bear his California mailing address rather than the Texas address of the Palmer Objectors . . . . The Palmer Objectors' objections and subsequent appeal appear little more than dilatory tactics of questionable motivation.

*In re Uponor Inc. F1807 Plumbing Fittings*, No.11-2247, Dkt. No. 132 (D. Minn. Sept. 11, 2012).

Although Bandas is the most notorious professional objector in this case, at least two courts have also criticized Weaver as a professional objector. *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-cv-03082-LB, 2016 WL 631880, at *9-10 (N.D. Cal. Feb. 17, 2016) ("Four people filed objections with the court: Steven Helfand, Sheri Lee Williams, Dawn Weaver, and Patrick Sweeney . . . . [A]s the plaintiffs have adequately shown, these are 'professional' objectors."); *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *6 n.3 (N.D. Cal. July 11, 2014) ("Dawn Weaver is represented by Attorney Darrell Palmer, who courts have 'widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector.'") (citation omitted); *see also Wilkins v. HSBC Bank Nev., N.A.*, No. 14 C 190, 2015 WL 890556, at *8 (N.D. Ill. Feb. 27, 2015) (holding that objection brought by Weaver "is not a reason to scuttle the settlement").

Courts give such professional objections very little weight, if any. That should hold especially true here, where there are no other objections at all. Indeed, courts routinely approve class settlements with dozens of objections; the Court should approve this Settlement, where there are no *bona fide* objections. The number of objectors and opt-outs "is extremely low and is

well in line with other cases in this circuit in which this factor was counted in favor of settlement approval." *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 365 (E.D. Pa. 2013) (approving a settlement with 24 objections, 581 opt-outs from a potential class of 68,892 members) (citations omitted); *see also In re Am. Bus. Fin. Servs. Inc.,* 2008 WL 4974782, at *6–7 (approving a settlement with thirty-two written objections, seven objections voiced at the final hearing and eighty opt-outs from a class of 29,000 members). The Third Circuit Court of Appeals has recognized the practical conclusion that it is generally appropriate to assume that "silence constitutes tacit consent to the agreement" in the class settlement context. *See Bell Atl. Corp. v. Bolger,* 2 F.3d at 1313 n.15. On this basis alone, the lack of objections here counts strongly in favor of approval.

## A. The Objection is Facially Invalid

Bandas and L&M totally fail to comply with the Court-ordered and duly noticed requirement to provide "[t]he number of times in which your counsel and/or counsel's law firm have objected to a class action settlement within the five years preceding the date that you file the objection, the caption of each case in which counsel or the firm has made such objection and a copy of any orders related to or ruling upon counsel's or the firm's prior objections that were issued by the trial and appellate courts in each listed case." Counsel for Plaintiff has also uncovered at least one objection to a class settlement made by Objector Weaver that she did not disclose in her objection. *See Choi v. Mario Badescu Skin Care, Inc.*, ___ Cal. Rptr. 3d ____, B257480, 2016 WL 3438077, at *3 n.3 (Cal. App. June 21, 2016) (referencing objection dismissed by Weaver). Therefore, Weaver's statement in her objection that she "has listed the number of times she has objected in the last five years with the date filed and caption for each case" (Dkt. No. 78 at 10) is an outright lie. Although Plaintiff was fortunate enough to uncover

this previously undisclosed objection thanks to an opinion being published two weeks ago, it is quite possible that Weaver has concealed additional cases in which she has objected.

The reason for the Court-ordered requirement to list prior objections of both the objector and objector's counsel is to allow the Court to assess whether the objection is valid or driven by a professional objector who makes a living filing objections against meritorious settlements. *In re Checking Account Overdraft Lit.*, MDL, No. 1:09-MD-02036, Dkt. No. 3331 at 26 & n.10 (S.D. Fla. Mar. 12, 2013) (holding that objector refused to provide "basic information" ordered by the court designed "to identify 'serial' or 'professional' objectors who play no positive role in class action litigation and contribute benefit to the class"). It appears that Bandas violated this explicit requirement in order to prevent the Court from discovering that he has likely objected in dozens or hundreds of cases; that his objections have routinely been rejected as profit-seeking; and that courts have routinely disciplined the objectors for their actions. *See* Request for Judicial Notice.

In any event, Bandas, L&M, and Weaver totally ignored this Court's order to provide this information regarding counsel's prior objections. For that reason alone, the objection is invalid and need not be considered. *E.g.*, *Zakskorn v. Am. Honda Motor Co.*, No. 2:11-CV-02610-KJM, 2015 WL 3622990, at *5 (E.D. Cal. June 9, 2015) ("[t]he court need not consider objections that do not comply with all of the requirements set forth in the Notice of Settlement."); *see also, e.g.*, *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 103 (E.D. Pa. 2012) (finding that "objections are procedurally deficient and need not be considered"); *In re Am. Family Enters.*, 256 B.R. 377, 398 (D.N.J. 2000) (overruling untimely filed objection prior to considering merits); *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *3 (N.D. Cal. Feb. 16, 2016) ("77 of the objections are procedurally improper. On this basis alone, the Court may refuse to

consider these objections.") (citation omitted). But even to the extent the Court were to consider

Mr. Bandas' lawyer-driven, cookie-cutter objections, they are meritless. Plaintiff will briefly

address each in turn.

### B. Bandas' Objections Are Without Merit

Objector Bandas argues that "Class counsel have imposed improper requirements on

objectors . . . with the obvious intention of driving down the number of objections to the class

action settlement."  Doc 78, at 5. Bandas is referring to the requirement that objectors provide

information so the Court can assess whether they are professional objectors:

> The number of times in which your counsel and/or counsel's law firm have
> objected to a class action settlement within the five years preceding the date that
> you file the objection, the caption of each case in which counsel or the firm has
> made such objection and a copy of any orders related to or ruling upon counsel's
> or the firm's prior objections that were issued by the trial and appellate courts in
> each listed case.

While Bandas listed prior cases in which he used Ms. Weaver to file an objection, he

refused to do so for himself or for his co-counsel, L&M. His argument that this is "burdensome"

is baseless. For the vast majority of Class Members, this is not a burdensome requirement at all,

since most Class Members are not serial, professional objectors like Mr. Bandas. The only

people this burdens are Bandas and other professional objectors. Of course, and as Bandas well

knows, requirements such as listing the "number of times in which you have objected" are

designed precisely to protect the Class from exactly the vexatious, harassing, and profit-seeking

professional objector behavior that Bandas is engaged in here. The requirements also allow the

Court to properly understand the context for such professional objections. Again, Bandas has

filed no fewer than 54 objections to class settlements over the last 10 years (*see supra*, Note 7);

his chosen objector Dawn Weaver has objected to at least nine different settlements. This is

important information, since such serial objections are an indication that the objections are

lawyer-driven—and thus not to be given weight that objections from truly concerned class members are given. It is for these reasons that courts routinely uphold the type of standard informational requirements in this Settlement. *E.g.*, *Shop-Vac Mktg. & Sales Practices Litig.*, No. 4:12-md-2380, 2016 WL 3035302, at *2 (M.D. Pa. May 26, 2016) (approving class notice requiring nearly identical objector information challenged by Bandas); *Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST, 2014 WL 4602572, at *7-8 (N.D. Cal. Sept. 15, 2014) (holding that notice satisfies due process where objectors were required to include information about previous objections by objector and counsel, among other information); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 662, 664 (S.D. Fla. 2011) (same).

Bandas has *no* support for his argument that this Court's requirement that he list prior objections is too burdensome. Indeed, *none* of the cases he cites stand for this proposition. He cites *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 83 (1st Cir. 2015), but in that decision the First Circuit *sustained* a district court's *rejection* of objections to a class settlement. Indeed, the panel rejected an argument from an objector that the Settlement placed a unique burden on objectors: "If the fairness of the settlement ultimately stands up to scrutiny, then the imposition of disparate requirements on objectors does not provide an independent basis for invalidating the settlement. That is the case here." *Id*. Bandas cites a Montana Supreme Court case called *Pallister v. Blue Cross & Blue Shield of Montana, Inc*., 2012 MT 198, ¶ 42, 366 Mont. 175, 190, 285 P.3d 562, 571 but that case nowhere even discusses objection requirements or in any way even hints that merely asking for a list of prior objections is improper. The same is true of the last case Bandas cites in support of his idea that listing prior objections is "burdensome." *See Redman v. RadioShack Corp*., 768 F.3d 622, 626 (7th Cir. 2014), *cert. denied sub nom. Nicaj v. Shoe Carnival, Inc.,* 135 S. Ct. 1429, 191 L. Ed. 2d 366 (2015). In short, Bandas has provided zero

authority for this Court to even consider in support of his novel view that the objection requirements here were "burdensome." For a professional objector with dozens of cookie-cutter objections under his belt, Bandas' inability to find even one court supporting his position is telling.

Second, Bandas argues that "class counsel have not submitted necessary information for this Court to evaluate the fairness of the settlement." Doc 78, at 9. The statement is entirely conclusory, since Bandas never once specifies what other information he believes is "necessary." That is because the Court has more than sufficient information (as did the Parties, after extensive discovery efforts). For example, in the Preliminary Approval Motion, which the Court granted, Plaintiff informed the Court that the recovery amounted to 13-48% of potential best case damages. Such estimates were not "conclusory," but were based on Plaintiff's extensive expert work to evaluate damages during discovery and to prepare for mediation. Zavareei Decl., ¶ 34. That was after having provided even more information to Magistrate Judge Wells—who oversaw the mediation during which the allocation plan was determined. *Id.*, ¶ 39 Moreover, the Settlement Agreement and Preliminary Approval Motion both describe in detail how each Class Member's award will be calculated.

In denying an objectors' similar request for more information, the court in *Casey* held that "[s]uch additional evidence and reports are irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate." *Casey v. Citibank, N.A.,* No. 1:13-CV-353, 2014 WL 4120599, at *1-2 (N.D.N.Y. Aug. 21, 2014). *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002) (because the inquiry into a proposed settlement structure "is limited to whether the settlement is lawful, fair, reasonable and adequate[,] . . . [an objector] must do more than just argue that she would have

preferred a different settlement structure"); *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13–21107–CIV, 2014 WL 3738013 (S.D. Fla. July 28, 2014) (denying objectors' request for discovery of material that did not relate to the fairness, adequacy, or reasonableness of the underlying settlement agreement).

And yet again, none of Bandas' cited cases actually support his argument. He cites *In re Baby Products*, a case in which he objected, but that holding simply faulted the court for entering final approval before it knew how many claims were made in a claims-made settlement. 708 F.3d at 175. There is no claims process here. Bandas also cites *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 384 (D. Minn. 2013), where a Minnesota court refused to grant *preliminary approval* where "the primary problem with the parties' submissions is that they provide almost no information enabling the Court to gauge the value of the proposed class's claims and, hence, the fairness and adequacy of the settlement." Clearly, this Court did not have a similar worry when it granted preliminary approval in this case, since Plaintiff provided precisely this information. This objection, too, is conclusory and baseless, and should be overruled.

Third, Bandas argues that "there has been no disclosure of the amount that will be or has been deducted from the common fund for costs of notice or settlement administration[.]" Doc 78, 10. Again, Bandas provides no support to show that is required; that is because it is not. There is a good reason for that: such expenses accrue to the benefit of the class, and are considered part of the settlement value by courts. "[A]bsent some agreement by the defendant to cover such costs, the *costs* necessarily would be subtracted from the recovery actually made available to class members. The absorption of these costs by the defendant clearly adds to the settlement's value and this value inures to the class." *Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 717-18 (W.D. Pa. 2015), *appeal dismissed* (Nov. 25, 2015). In other words, the

costs of administration and notice are not somehow separate from the settlement; they are part of the value of the settlement that the Court evaluates. Again, Bandas has no authority to the contrary—he does not even attempt to cite a case for the proposition that the class must be informed of notice and administration costs.

Fourth, Bandas' next unfounded assertion flows from his failure to understand this principle (that fees and expenses must be treated as a benefit to the class). He argues that "the average class member would appear to receive only $6." He only arrives at that figure by *excluding* the requested attorneys' fee amount from the value of the settlement. But again, such fees are a value to the Class—they received legal services—and courts uniformly agree. "Under the percentage-of-fund method, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by the settling defendants' separate payment of attorney's fees and expenses, and the expenses of administration." *Lake Forest Partners, L.P. v. Sprint Commc'ns Co., L.P.*, No. 2:12–cv–00999–AJS, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 (1980). When this principle is understood, of course, the settlement benefits provide far more than an average of $6 to class members.

As discussed in detail above, this Settlement easily meets all the *Girsh* factors, and simply arguing—as Bandas does—that the "settlement should be better" is not a serious objection. *Henderson v. Volvo Cars of N. Am.*, Civil Action No. 09–4146, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) (collecting cases rejecting objections to class settlements that merely complained about the lack of full relief and holding that "[o]bjections based solely on the amount of the award lack merit"). Such objections "do not sufficiently appreciate the fact that this is a *settlement,* not an award that will necessarily make all of the claimants whole for any damages

incurred. Indeed, the very nature of a 'settlement' is that it represents a compromise, not full compensation for all potential damages that could be awarded in a successful lawsuit." *In re Imprelis,* 296 F.R.D. at 365-66. "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *In re Cendant Corp. Sec. Litig.,* 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citation omitted). Rather, the recovery percentage "must represent a material percentage recovery to plaintiff, in light of all the risks considered under *Girsh.*" *Id.* (internal quotation marks omitted).

As described above—and as totally ignored by Bandas—those risks are very real here. Still, the settlement amount represents approximately 13-48% of estimated actual damages. Courts routinely find such a recovery to be reasonable. *See In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 489–90 (E.D. Pa. 2003); *see also* Section IV.B.7, *supra*.

Fifth, Bandas also argues that "class counsel have not disclosed anything about the residual cy pres, nor have they designated a charity." Doc. 78, 11. There is nothing to disclose— yet. Every cent of the Net Settlement Fund (after expenses and attorneys' fees) will be delivered to Settlement Class Members. It is only if class members fail to cash checks that there will be any residual funds at all. As the Settlement makes clear, if there are any remaining funds Class Counsel and Defendant will consider the feasibility of a secondary distribution of those funds. Only then is there even a possibility of a *cy pres* award. Agreement, ¶ 83b-c. Even then, any proposed *cy pres* recipient must be "approved by the Court." *Id.*, ¶ 83c. It will ultimately be up to the Court, not to Class Counsel or Defendant, where any *cy pres* funds are awarded—if any.

Sixth, Bandas complains about the requested $20,000 service award to Plaintiff Bodnar. As discussed in the concurrently filed Motion for Attorney Fee and Expense Award, and Service

Award, the award is in line with others in this Circuit, and the amount properly rewards Plaintiff for her continued efforts to advance this litigation. The objection is baseless.

Seventh, Bandas appears to argue that there is some sort of "intra-class conflict" because all members of the class will receive a minimum $5 disbursement. There is no "conflict." This allocation decision was reached with the assistance of Judge Wells, acting as a mediator. And the decision makes good sense. Due to the costs of mailing checks, it makes little sense to mail checks for dollar amounts lower than $5—it costs nearly as much to mail as the value to the recipient. That is why courts routinely approve such minimum distributions. "*[D]e minimis* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10." *In re Gilat Satellite Networks, Ltd.,* No. CV–02–1510, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007); *see, e.g., In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) (noting that the minimum recovery requirement is a common procedure that addresses "the undeniable fact that claims-processing costs money, which comes out of the settlement fund"); *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 463 (E.D. Pa. 2008) (approving settlement plan with $50 minimum payment). No conflict arises from this common-sense, administrative decision not to mail tiny checks—a decision which keeps the Settlement Class' resources from being wasted.

Bandas totally misunderstands the nature of intra-class conflict. Obviously, not all intra-class conflicts will defeat the adequacy requirement. *See* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions: Law & Practice* § 4:30 (8th ed. 2011) ("Not all allegations of conflict will make a proposed representative inadequate."). A "conflict must be 'fundamental' to violate Rule

23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011); *see also Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) ("For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental." (internal quotation marks omitted)); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy."). There is no fundamental conflict here—there is not even close to being a minor one—arising from the common sense decision to mail checks with a minimum value of $5. It in no way touches on the issues in controversy between the Settlement Class and the Bank.

The very case Bandas cites—*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012)—held that there was no fundamental intra-class conflict, even where the dispute in the litigation regarded an auto defect that only some class members had actually experienced. There is certainly none here.

Eighth, Bandas complains about the amount of the attorneys' fee request, which he calls "exorbitant," Doc 78, at 16, because it exceeds what Bandas describes as the "25% benchmark for common fund settlements." As described in concurrently filed fee petition, there is no such "benchmark." Class Counsel addresses this objection fully in that paper.

Ninth, Bandas also argues that "there is no procedure in place for any objector to object to Class counsel's motion for attorneys' fees and costs." Doc 78, at 19. The argument is nonsensical, since Bandas has already submitted a lengthy objection thereto, and Class Counsel fully informed Settlement Class Members of its fee request on every notice issued to Class Members.

Lastly, Bandas objects "to the extent a lump sum attorneys' fee award is made to multiple firms without judicial allocation of the funds." Although the substance of Bandas' complaint is difficult to understand from his one-sentence objection, judicial allocation of attorneys' fees is nowhere required. *In re Warfarin*, 391 F.3d at 533 n.15 (affirming district court's rejection of similar objection on the grounds that "the distribution of an attorney fee award among counsel is and should be a 'private matter' for the attorneys to resolve amongst themselves") (quoting *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1256 (N.D. Ill. 1993)). Moreover, the cases Bandas references are off-point. In *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, the fee award at issue involved 79 lawyers from 32 law firms representing plaintiffs in a sprawling litigation, and certain plaintiffs' attorneys complained that the Court accepted the fee apportionment by five attorneys, done without notice to the other plaintiffs' attorneys. 517 F.3d 220, 224-26 (5th Cir. 2008). And in *In re Agent Orange Prod. Liab. Litig.*, the court took issue with not being aware of a fee sharing agreement between counsel until four months after a class settlement. 818 F.2d 216, 218, 226 (2d Cir. 1987). Here, the law firms comprising Lead Class Counsel and Class Counsel jointly moved for interim leadership early in the case, fully disclosing their relationship to the Court. Bandas' last, one-sentence objection, like his other objections, is baseless.

## VIII.   CONCLUSION

For these reasons, and those detailed herein, Plaintiff respectfully requests that the Court certify for settlement purposes the Settlement Class, pursuant to Rule 23(b)(3) and (e) of the Federal Rules of Civil Procedure and finally approve the Settlement.

Dated: July 5, 2016

   /s/ Hassan Zavareei     
Hassan A. Zavareei (*pro hac vice*)
Jeffrey Kaliel (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

*Lead Class Counsel*

Jeffrey M. Ostrow (*pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
200 S.W. First Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com

James C. Shah
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
jshah@sfmslaw.com

*Class Counsel*

## **CERTIFICATE OF SERVICE**

I, Hassan Zavareei, hereby certify that the foregoing document was filed via the Court's CM/ECF system on July 5, 2016, thereby causing a true and correct copy to be served on all ECF-registered counsel of record.

                                           /s/ Hassan A. Zavareei

                                           Hassan A. Zavareei